**AMANULLAH & Wahidullah,**
**Plaintiffs, Appellants,**

v.

**Alan C. NELSON, Charles T. Cobb, and**
**Anne Frank, Defendants, Appellees.**

**Mohammed OSMAN MOHIBI,**
**Plaintiff, Appellant,**

v.

**Alan C. NELSON, Etc., et al.,**
**Defendants, Appellees.**

**Ziaullah SADDOZAI,**
**Plaintiff, Appellant,**

v.

**Alan C. NELSON, Commissioner of the**
**Immigration and Naturalization**
**Service, et al., Defendants, Appellees.**

**Nos. 86–1604, 86–1625 and 86–1635.**

United States Court of Appeals,
First Circuit.

Argued Dec. 3, 1986.
Decided Feb. 4, 1987.

Marjorie Heins, Massachusetts Civil Liberties Union Foundation, with whom Richard C. Csaplar, Jr., Margaret H. Marshall, Kerry J. Tucker, Csaplar & Bok, Boston, Mass., Regina F. Lee, The Legal Services Center, Jamaica Plain, Mass., Arthur C. Helton, Lawyers Committee for Intern. Human Rights, New York City, and Margaret Bruer were on brief, for plaintiffs, appellants.

Michael P. Lindemann, Office of Immigration Litigation, with whom Richard K. Willard, Asst. Atty. Gen., and Thomas W. Hussey, Asst. Director, Office of Immigra-

tion Litigation, Washington, D.C., were on brief, for defendants, appellees.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

The petitioners in these consolidated appeals are four Afghanistanis who are currently being detained by the federal Immigration and Naturalization Service (INS) pending final resolution of exclusion proceedings against them. Having been denied parole from detention, they filed a total of three petitions for writs of habeas corpus in the United States District Court for the District of Massachusetts.[1] These applications were assigned to different district judges, but with uniform results: each petition was summarily denied without an evidentiary hearing. Appeals were taken across the board. Because of the resemblance among the cases, we consolidated the appeals for briefing and oral argument.

## I. FACTUAL BACKGROUND

There are some similarities in the bittersweet tales of these four young men, all of whom claim to have fled to American shores in consequence of the unsettled— and dangerous—political situation in their homeland. And, there are some idiosyncratic wrinkles as well. We briefly inspect their circumstances (but, inasmuch as the merits of their asylum applications are not before us, we discuss the facts only to the extent necessary to facilitate an understanding of the issues presented by these appeals).

Mohammed Osman Mohibi arrived at Kennedy Airport in New York on October 17, 1985. He carried no passport, ticket, boarding pass, or other documentation. Initially, the INS could not determine who he was or from whence he had come. Mohibi was detained and, later, questioned. He thereafter admitted using fraudulent documents to facilitate his travel to New York. The INS determined that Mohibi was excludable from the United States on a plethora of grounds: as a stowaway, as an "intending immigrant" who lacked valid papers, and as an undocumented nonimmigrant. Accordingly, Mohibi's detention was prolonged pending further exclusion proceedings.

Ziaullah Saddozai arrived via Trans-World Airlines from Bombay, India on November 16, 1985. He likewise landed at Kennedy without travel documents or identification. During the interrogation which ensued, Saddozai confessed that he had paid $2000 to a smuggler for false papers and a berth on the aircraft. Saddozai's detention, on much the same grounds as Mohibi's, followed apace.

Amanullah and Wahidullah arrived together at Kennedy on November 23, 1985, aboard a flight from Bombay. They claimed to be in transit to a Canadian destination. Both had used counterfeit Netherlands passports to get as far as New York. They acknowledged paying some $1500 each to a document procurer in India for the bogus paperwork. An INS inspector advised them that they could not enter the United States bearing ersatz documents, even as temporary visitors in transit. They were, however, offered the chance to withdraw their applications for admission and to return to India. But, they chose to remain in the United States and were taken into custody.

As the government notes, these young men in each case fled immediately from India or Pakistan, rather than from Afghanistan itself. There is no question but that, although life in such a venue avoided the physical danger and threat of persecution which was present in their homeland, it was far from idyllic. The situation faced by Amanullah and Wahidullah is illustrative. In India, their existence was margin-

---

1. Two of the applicants (Amanullah and Wahidullah) filed jointly; the others filed separately. All of the petitioners share common counsel. The respondents, who appear as appellees before us, include Alan C. Nelson, Commissioner of the INS, Charles T. Cobb, the INS district director, and Anne Frank, the assistant district director for deportation, detention, and parole. Both Cobb and Frank are based in Boston, Massachusetts.

al at best. Afghanistanis are not, as a rule, given formal refugee status there. Without such standing, they had no legal right to work. Unable to work, they subsisted on the meager stipends proffered by the United Nations High Commission on Refugees (hardly enough to cover rent, electricity, and water for a small room in New Delhi). Amanullah and Wahidullah credibly claim that they were forced to go without meals on occasion in order to meet the rent. And, poverty was not the only problem: some refugees lived in fear of informers and Afghanistani government agents. Saddozai and Mohibi fared little better in their layovers between Afghanistan and the United States.

All four of the petitioners were detained pending the resolution of exclusion proceedings directed at them. All four have since applied for political asylum under 8 U.S.C. § 1158 (1982) and for withholding of deportation pursuant to 8 U.S.C. § 1252(h) (1982). The exact status of these various applications is not directly germane to the matter before us; it suffices to say that, to this date, the petitioners have neither received meaningful relief nor abandoned their efforts to find sanctuary in this country. While awaiting the outcome of their exclusion/entry proceedings, each petitioner requested that he be released on parole. The INS district director, Charles Cobb, refused. These habeas petitions ensued.

During their months in custody, the appellants have been in residence at a variety of INS detention centers. Such confinement has not been unduly onerous. In Boston, for example, they were confined to two rooms—but not without some amenities (*e.g.*, television, table tennis, telephones). Although custody of any kind is limiting and presumptively unpleasant, the circumstances of the appellants' detention cannot be described as oppressive in any way.

## II. THE LEGAL LANDSCAPE

It is helpful to begin our sojourn with a review of the legal principles, statutes, and regulations which govern the admission, exclusion, detention, and parole of aliens.

### A. *Statutory Framework*

Congress, of course, has plenary power to admit aliens to the United States or, conversely, to bar them. *Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972). The Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). The Court has repeatedly emphasized that, as respects the admission vel non of aliens, "over no conceivable subject is the legislative power of Congress more complete." *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977), quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). As Justice Harlan wrote almost a century ago,

> [t]he power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive offices, without judicial intervention, is settled by our previous adjudications.

*Lem Moon Sing v. United States*, 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895).

By statutory enactment, Congress has delegated its unusually broad dominion in the immigration field to the Attorney General. Thus, 8 U.S.C. § 1103 (1982) provides in pertinent part that:

> [t]he Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as [power may be delegated to other executive officials] ... *Provided, however,* that determination and ruling by the Attorney General

with respect to all questions of law shall be controlling.... (emphasis in original)

The Attorney General is ceded the "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens ...," *id.*, and is directed to "establish such regulations ... as he deems necessary for carrying out" these grants of authority. *Id.* In short, it is readily apparent that Congress has invested the Attorney General with vast discretion anent immigration matters.

Congress, speaking generally, has defined those conditions which render aliens excludable from the United States. *See* 8 U.S.C. § 1182 (1982). The statute provides, inter alia, that the

... following classes of individuals ... shall be excluded from the United States:

\* \* \* \* \* \*

... (18) Aliens who are stowaways;

(19) Any alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact;

(20) ... any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document ..., and a valid, unexpired passport, or other suitable travel document, or document of identity and nationality ...

\* \* \* \* \* \*

(26) Any nonimmigrant who is not in possession of (A) a [proper] passport ... and (B) at the time of application for admission, a valid nonimmigrant visa or border crossing identification card.

8 U.S.C. §§ 1182(a)(18), (19), (20), (26) (1982).

■ Those aliens who lack the (valid) documentation which the statute contemplates are subject to exclusion—and, once preliminarily determined to be excludable, Congress has decreed that they may be held in detention. The statutory authority for such impoundment is direct and to the point:

Every alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry....

8 U.S.C. § 1225(b) (1982).[2]

■ To be sure, detention "for further inquiry," *see id.*, is not explicitly tantamount to a command that aliens may be held in quarantine pending the ultimate resolution of debarment proceedings against them—yet the language has been so interpreted. 1A C. Gordon & H. Rosenfield, *Immigration Law and Procedure.* §§ 3.17(b), (c) (Revised ed. and Cum.Supp. 1986) (hereinafter Gordon & Rosenfield). And, interpretation of § 1225(b) in that fashion seems altogether plausible. That is not to say, however, that detention is an inescapable corollary of exclusion proceedings. Congress has authorized the Attorney General, in his discretion, to grant parole to any nonadmitted alien when the Attorney General deems such lenity to be in the public interest. *See* 8 U.S.C. § 1182(d)(5) (1982).

The scope of the parole authority is close to plenary. The statute itself professes that:

[t]he Attorney General may, ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States....

8 U.S.C. § 1182(d)(5)(A) (1982).

The same statute also insures that the mere granting of parole "shall not be regarded as an admission of the alien...." *Id.* Instead, the law provides that "when the purposes of such parole shall, in the

---

**2.** In addition to providing explicitly for holding aliens not entitled to land, Congress plainly anticipated that persons seeking asylum would be detained pending consideration of their applications. *Singh v. Nelson,* 623 F.Supp. 545, 558 (S.D.N.Y.1985); *see* S.Rep. No. 256, 96th Cong., 2d Sess. 17, *reprinted in* 1980 U.S.Code Cong. & Admin.News 141, 157.

opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled...." *Id.* His case shall thereafter be treated in the same manner as that of any other applicant for admission. *Id.* We agree with the Eleventh Circuit's assessment of the situation: "Congress has delegated remarkably broad discretion to executive officials under the [Immigration and Nationality Act], and these grants of statutory authority are particularly sweeping in the context of parole." *Jean v. Nelson,* 727 F.2d 957, 977 (11th Cir.1984) (en banc), *aff'd in part on nonconstitutional grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

The legislative history of the parole statute demonstrates clearly that Congress intended that such largesse be extended infrequently, where exigent circumstances obtained. In this vein, the House Report accompanying the 1952 Act stated,

> [t]he committee believes that the broader discretionary authority is necessary to permit the Attorney General to parole inadmissible aliens into the United States in emergency cases, such as the case of an alien who requires immediate medical attention before there has been an opportunity for an immigration officer to inspect him, and in cases where it is strictly in the public interest to have an inadmissible alien present in the United States, such as, for instance, a witness or for purposes of prosecution.

H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Admin.News 1653, 1706. *See also Ishtyaq v. Nelson,* 627 F.Supp. 13, 18 (E.D.N.Y.1983).

 We are fully persuaded that, as originally conceived by the enacting Congress, parole was meant to be the exception rather than the rule. It was to be catalyzed only by the existence of an emergency (whether a *personal* emergency, such as an alien's medical needs, or a *public* emergency, such as a national need to have the alien present within the country). This view, though rigid, was well within the legislature's choice of prerogatives.

And, the same sort of inelastic fabric was rewoven in 1965 when Congress repealed the national origin quota provisions of the Immigration and Nationality Act and substituted a system of preferential admissions. *See* S.Rep. No. 748, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 3328, 3335:

> ....[I]t is the express intent of the committee that the parole provisions of the Immigration and Nationality Act, which remain unchanged by this bill, be administered in accordance with the original intention of the drafters of that legislation. The parole provisions were designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law.

The legislative history of the parole statute, 8 U.S.C. § 1182(d)(5), demonstrates beyond cavil that Congress consistently visualized parole as an indulgence to be granted only occasionally, in the case of rare and exigent circumstances, and only when it would plainly serve the public interest. The historical record admits of no doubt on this score. One can argue the wisdom of such a tight-fisted choice, or whether it comports with accepted notions of the American ideal. But, in what is demonstrably something less than the best of all possible worlds, it cannot reasonably be argued but that the Congress has sown the seeds of the parole authority in such a scanty way as to plant a decidedly austere garden.

### B. *The 1982 Regulations*

Although the national legislature remained, over the years, fairly constant in its views of the parole process, the statutes typically left room for the exercise of administrative discretion. This is, of course, an acceptable—indeed, commonplace—way for the legislative and executive branches of our government to interface. And, from time to time, the Attorney General and the

INS (to whom the Attorney General largely delegated the question) took a more permissive stance toward parole than the harsh verbiage of the statutes seemed to herald. As a result, there has been a certain ebb and flow in the implementation of the parole provisions.

Prior to 1981, for the most part, INS employed a relatively liberal policy in this respect. The agency's administrative approach was to release aliens on parole unless they were security risks or thought likely to abscond. *Jean v. Nelson*, 105 S.Ct. at 2995; *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958). Nevertheless, all things change. In response to its self-generated perception that unmanageably large numbers of undocumented aliens were arriving from Haiti and Cuba, the INS shifted gears and adopted a far more restrictive protocol. *See Jean v. Nelson*, 105 S.Ct. at 2995; *Singh v. Nelson*, 623 F.Supp. at 556.

The policy embodied in the 1982 regulations, currently in effect,[3] calls for the detention of undocumented and fraudulently documented aliens, and makes allowance for parole only under carefully circumscribed circumstances. *See* 8 C.F.R. §§ 235.3, 212.5 (1986). The intent of the new regulations was twofold: (1) to deter aliens from attempting to enter the United States illegally, and (2) to return the use of the parole power to the sparing engagement originally foreseen by the Congress. *See* 47 Fed.Reg. 30,044–45 (July 9, 1982).

The detention regulations are codified at 8 C.F.R. § 235.3 (1986). They permit the quarantine of persons arriving at a port until the time they are admitted to the country. 8 C.F.R. § 235.3(a). The regulations further provide that

... Any alien who appears to the inspecting officer to be inadmissible, and who arrives without documents ... or who arrives with documentation which appears on its face to be false, altered, or

to relate to another person ... *shall be detained* in accordance with section 235(b) of the Act [8 U.S.C. § 1225(b)]. Parole of such aliens shall only be considered in accordance with § 212.5(a) of this chapter.

8 C.F.R. § 235.3(b) (emphasis supplied).

Aliens who carry valid papers, but who nevertheless appear to the inspecting officer to be inadmissible for some reason, may be detained, paroled, or paroled for deferred inspection. 8 C.F.R. § 235.3(c). Under certain circumstances, aliens subject to detention may be placed in the custody of the carrier. 8 C.F.R. § 235.3(d).

In formulating the parole calculus under § 1182(d)(5) vis-a-vis detained aliens, the current regulations state that the following factors are to be considered:

(1) The parole of aliens who have serious medical conditions in which continued detention would not be appropriate would generally be justified by "emergent reasons";

(2) The parole of aliens within the following groups would generally come within the category of aliens for whom the granting of the parole exception would be "strictly in the public interest", provided that the aliens present neither a security risk nor a risk of absconding:

(i) Women who have been medically certified as pregnant;

(ii) Aliens who are defined as juveniles [under certain conditions] ...

(iii) Aliens who have close family relatives in the United States (parent, spouse, children, or siblings who are United States citizens or lawful permanent resident aliens) who are eligible to file, and have filed, a visa petition on behalf of the detainee;

(iv) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States;

---

**3.** These regulations were promulgated in final form in 1982, 47 Fed.Reg. 46,493 (Oct. 19, 1982), and we refer to them betimes as "the 1982 regulations." They have remained unchanged since the date they became final. For ease in reference, we cite throughout to the most recent edition of the same regulations at 8 C.F.R. §§ 235.3, 212.5 (1986).

(v) Aliens whose continued detention is not in the public interest as determined by the district director.

(3) Aliens subject to prosecution in the United States who are needed for the purposes of such prosecution may be paroled to the custody of the appropriate responsible agency or prosecuting authority.

8 C.F.R. § 212.5(a) (1986).

Subsection (b) of the regulations permits the INS district director to grant parole to all other arriving aliens, except those detained under 8 U.S.C. § 1225(b). 8 C.F.R. § 212.5(b). Subsection (c) of the regulations defines conditions which the district director can impose upon an alien's parole, if he chooses affirmatively to exercise his discretion. 8 C.F.R. § 212.5(c). Subsection (d) provides for the termination of parole. 8 C.F.R. § 212.5(d).

## III. THE PETITIONERS' PREDICAMENT

Against the backdrop of this statutory/regulatory mosaic, it can be seen that these appellants are currently detained in pursuance of 8 U.S.C. § 1225(b), pending the final resolution of exclusion proceedings. As the record bears out, each and all of them have been found preliminarily, and for a variety of reasons, to be excludable under the provisions of 8 U.S.C. § 1182. All have requested interim parole, 8 U.S.C. § 1182(d)(5), but the INS district director has exercised his discretion to deny that dispensation, concluding that it would not be in the public interest to furlough any of the petitioners. Cobb found, inter alia, that the appellants did not qualify for parole under 8 C.F.R. § 212.5(a) and that each of them was likely to abscond if left at liberty. Three different district judges have upheld these determinations.

The petitioners-appellants, in arguing that their habeas applications should not have been rejected, offer a salmagundi of grounds for our lucubration. Some of them are so tenuous or insubstantial that they do not merit discussion—or even comment. There are, however, four general points which deserve further consideration. First, the appellants claim that their continuing detention violates the due process clause of the fifth amendment to the federal Constitution. Second, they argue that Cobb's decisions to deny parole constituted flagrant abuses of his discretion. Third, they urge that their sequestration by the INS under the current regulations transgresses their rights to apply for asylum under the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980). Lastly, they contend that, at the very least, evidentiary hearings should have been held below (and that the district court's refusal to do so constituted reversible error). We will address each of these contentions in turn.

## IV. DUE PROCESS

The Supreme Court has recently restated the doctrinal tenet which controls the constitutional status of excludable aliens: "[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). *See also Fiallo v. Bell*, 430 U.S. at 792, 97 S.Ct. at 1477; *Kleindienst v. Mandel*, 408 U.S. at 762, 92 S.Ct. at 2581; *Jean v. Nelson*, 727 F.2d at 968 ("Aliens seeking admission to the United States therefore have no constitutional rights with regard to their applications and must be content to accept whatever statutory rights and privileges they are granted by Congress."); *Bertrand v. Sava*, 684 F.2d 204, 211–12 (2d Cir.1982). As to excludable aliens, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Jean v. Nelson*, 727 F.2d at 968, quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892). Furthermore, as the Eleventh Circuit has observed, excludable aliens cannot challenge either admission decisions or parole decisions under a claim of constitutional right. *Jean v. Nelson*, 727 F.2d at 972.

■ The appellants endeavor to obfuscate these immutable principles by a series of (largely pointless) syllogisms. To be sure, outside the context of admission and exclusion procedures, excludable aliens do have due process rights. *See Jean v. Nelson*, 105 S.Ct. at 3007–09 (Marshall, J., dissenting); *Jean v. Nelson*, 727 F.2d at 972–73. When a detained alien is criminally prosecuted, for example, "he must enjoy at trial all of the protections that the Constitution provides to criminal defendants." *Jean v. Nelson*, 105 S.Ct. at 3007 (Marshall, J., dissenting). Excludable aliens also have *personal* constitutional protections against illegal government action of various kinds; the mere fact that one is an excludable alien would not permit a police officer savagely to beat him, or a court to impose a standardless death penalty as punishment for having committed a criminal offense. But, within the contours of the admission/exclusion paradigm, these doctrines are beside the point.

■ In the cases at bar, the detention of the appellants is entirely incident to their attempted entry into the United States and their apparent failure to meet the criteria for admission—and so, entirely within the powers expressly conferred by Congress. The petitioners were lawfully detained pursuant to 8 U.S.C. § 1225(b) in the first instance and lawfully held thereafter. The district director had discretion to grant or deny parole to them pursuant to 8 U.S.C. § 1182(d)(5) and 8 C.F.R. § 212.5. Cobb exercised that discretion: not affirmatively, but negatively; not to the appellants' liking, but within the perimeters of his authority. The appellants have been immured pending the final resolution of the

exclusion proceedings and their parallel asylum applications—and on no other basis. Indeed, detention of this nature was explicitly approved in *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981), a case upon which the petitioners (mistakenly) rely. In *Rodriguez-Fernandez*, the Tenth Circuit noted that

... since the statute contemplates temporary detention, we hold that detention is permissible during proceedings to determine eligibility to enter and, thereafter, during a reasonable period of negotiations for their return to the country of origin or to the transporter that brought them here.

*Id.* at 1389.[4]

■ There is no suggestion of unwarranted governmental footdragging in these cases; prompt attention appears to have been paid to the administrative aspects of exclusion and asylum. Detention has not been unnecessarily prolonged. Based on the consentient authorities, we conclude that there is no violation of due process inherent in the exercise by the INS district director of his power to deny parole to the appellants pending the ultimate (seasonable) resolution of the exclusion/asylum proceedings in which they are yet involved.

## V. THE DISTRICT DIRECTOR'S DISCRETION

■ Passing their constitutional onslaught, the appellants next declaim that the district director abused his discretion in the circumstances of these cases. The argument itself, as it has been stated by the petitioners, is misleading and constitutes a kind of paralepsis: inasmuch as the decisions which we are called upon to consider

4. Although the court concluded that the habeas petitioner in *Rodriguez-Fernandez* was unlawfully detained, the facts of that suit are materially different from the cases before us. There, a final exclusion and deportation order had already been entered against Rodriguez-Fernandez. Nevertheless, his detention continued, pending location of a place to which he could be deported. 654 F.2d at 1384. Difficulties in effectuating departure (not attributable to voluntary acts of the alien) resulted in his confinement in a maximum security federal prison for over a year *after* the deportation order had become final. *Id.* at 1385. In the Tenth Circuit's term, his detention had become "imprisonment ... prolonged; perhaps ... permanent." *Id.* In contrast, the present petitioners are still in the midst of exclusion/asylum proceedings; their detention, pending resolution of such ongoing matters, is in no veridical sense "indefinite or permanent." *Bertrand v. Sava*, 684 F.2d at 207 n. 6. And, the custodial setting is unexceptionable.

were discretionary parole decisions made incident to exclusion proceedings, the applicable standard of review is not "abuse of discretion" at all, but is that limned by *Kleindienst v. Mandel, supra.* In *Kleindienst,* the Supreme Court noted the plenary sweep of Congress's power to make policies and rules for the exclusion of aliens. 408 U.S. at 765–67, 92 S.Ct. at 2582–84. The Court held that when "the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it...." *Id.* at 770, 92 S.Ct. at 2585. Though the petitioners rail against this rubric as being overly obsequious in its deference to the Attorney General and the INS, it has been buttressed by more recent Supreme Court decisions. *E.g., Landon v. Plasencia,* 459 U.S. at 32, 103 S.Ct. at 329; *Fiallo v. Bell,* 430 U.S. at 794–95, 97 S.Ct. at 1479. Other courts of appeal have likewise applied the "facially legitimate and bona fide reason" benchmark when reviewing exercises of the Attorney General's discretion to grant or deny parole. *See Perez-Perez v. Hanberry,* 781 F.2d 1477, 1482 (11th Cir.1986); *Sidney v. Howerton,* 777 F.2d 1490, 1491 (11th Cir.1985); *Garcia-Mir v. Smith,* 766 F.2d 1478, 1485 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986); *Jean v. Nelson,* 727 F.2d at 977; *Bertrand v. Sava,* 684 F.2d at 212–13. *Cf. Hotel & Restaurant Employees Union, Local 25 v. Attorney General,* 804 F.2d 1256, 1271–72 (D.C.Cir.1986) (In challenge to INS's pursuit of alleged "wavering policy" concerning extensions of voluntary departure, court of appeals holds that: "Where Congress has not seen fit to limit the agency's discretion to suspend enforcement of a statute ..., we cannot review facially legitimate exercises of the discretion.").[5]

■ This is the standard constituted by *Kleindienst* and we follow it. In so doing we are mindful that, in the context of deportation proceedings, we have used an "abuse of discretion" yardstick as a means of gauging discretionary administrative action. *See Williams v. INS,* 773 F.2d 8, 9 (1st Cir.1985); *Ananeh-Firempong v. INS,* 766 F.2d 621, 626 (1st Cir.1985); *Holley v. INS,* 727 F.2d 189, 191 (1st Cir.1984). *Leblanc v. INS,* 715 F.2d 685, 691, 693 (1st Cir.1983); *Vaughn v. INS,* 643 F.2d 35, 37 (1st Cir.1981). It is well established, however, that *deportable* aliens are properly accorded greater rights than *excludable* aliens. *Landon v. Plasencia,* 459 U.S. at 25–27, 103 S.Ct. at 325–26. As stated by Justice O'Connor, "once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Id.* at 32, 103 S.Ct. at 329. When the act of the sovereign keeps a putatively unentitled person from something he never had, such "deprivation" (if it can be classified as a "deprivation" at all) is of a fundamentally different character than that which occurs when the government takes from a person—even a putatively unentitled person—something he theretofore enjoyed. Deportation of one already in residence in the United States is a deprivation of the latter sort, and "abuse of discretion" seems a fair and feasible approach when reviewing the deployment of discretion in such proceedings. Exclusion, however, falls within the former category. And, as have the Second and Eleventh Circuits, *see supra,* we conclude that the "facially legitimate and bona fide reason" standard should be applied to assay

---

5. Although it appears that the Fifth Circuit is in accord, the waters are somewhat murky. In *Pierre v. United States,* 547 F.2d 1281, 1289 (5th Cir.1977), the court, in discussing the rejection of the plaintiffs' applications for refugee status, remarked that INS's "discretionary judgment" on the point "is reviewable by us only for abuse of discretion." In support of this proposition,

however, the panel cited only to *Kleindienst v. Mandel, supra,* and specifically, to the very portion of the Court's opinion, 408 U.S. at 770, 92 S.Ct. at 2585, which articulated the "facially legitimate and bona fide reason" standard. Thus, *Pierre,* despite its awkward locution, seems entirely consistent with our view of the controlling rule.

discretionary action in exclusion proceedings.[6]

■ We thus scrutinize the record to ascertain whether Cobb advanced a facially legitimate and bona fide reason for withholding parole from these appellants. The answer to this inquiry is neither elusive nor doubtful. The district director denied each request for parole based on his determination that the appellants, without exception, fell considerably short of qualifying for relief under 8 C.F.R. § 212.5(a). He concluded that the public interest would be disserved by parole, especially since the appellants had flouted established immigration procedures applicable to refugees seeking admission to the United States. The district director also ascertained that the petitioners were ineligible for release because of the substantial risk of elopement. And, freeing them from detention would, in Cobb's announced judgment, have created an ever-increasing law enforcement problem for the INS.

These findings are not without record support. They follow from Cobb's assessment that the petitioners' prospects for eventual admission by way of asylum were uniformly dim—an evaluation which has been borne out by administrative proceedings to this date. They spring, too, from the very facts surrounding the appellants' arrival in this country—facts which were, in each case, laden with cause for skepticism and suspicion. Three of the petitioners had no close family ties to the United States; the fourth, Saddozai, claimed a family tie of dubious legitimacy.[7] In no instance had the true identity of any petitioner been established by independent means. All of them had made profligate use of bogus documentation in the attempt to arrive and gain illicit entry. Despite their pleas of poverty, large sums of money had been squirrelled away and paid over to obtain apocryphal paperwork. According to the district director, the petitioners had demonstrated both an ability and a willingness to manipulate and to evade the immigration laws. That inference, given the appellants' course of conduct, was not only plausible, but compelling.

Given this chronicle of events and determinations, it would be presumptuous—and wrong—for us to say that the minimal requirements of *Kleindienst v. Mandel, supra*, were not met. The district director advanced numerous facially legitimate reasons for refusing parole to these appellants. These reasons appear bona fide, both in isolation and in juxtaposition to the administrative record. There is neither need nor warrant to proceed further: the decisions to deny parole to these four undocumented aliens were well within the wide sweep of the district director's discretion. This prong of the consolidated appeals is meritless.

## VI. THE REFUGEE ACT

The appellants' flagship asseveration is that detention in the circumstances of these cases, pursuant to the 1982 regulations, impermissibly suppresses their rights to seek political asylum under the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat.

6. *Moret v. Karn*, 746 F.2d 989 (3d Cir.1984) is not to the contrary. *Moret*, unlike the cases at bar, implicated a situation where the INS failed to follow its own regulations and procedures (for termination of parole of Mariel Cubans). *Id.* at 991–93. Moreover, *Moret* dealt not with the grant of parole, but with revocation of a parole previously granted. *Id.* at 990. The Third Circuit was careful to note that the forfeiture of Moret's parole not only abused the agency's discretion, but also transgressed the "facially legitimate and bona fide reason" standard. *Id.* at 993 n. 3.

7. Saddozai's affidavit, executed on the day he arrived, revealed some grave inconsistencies in his story. When questioned by an immigration inspector about whether he had family in this country, Saddozai at first indicated that he had only two brothers here. In this affidavit, he spelled and signed his surname with a single "d". When he later applied for asylum, he submitted a letter from one Khadije Saddozai, a woman who had lived in the United States for several years. She claimed that he was her son. In subsequent submissions, this petitioner changed the spelling of his name to match that of his would-be mother. The relationship has proven impossible to verify or disprove. The appellees can scarcely be castigated for their unwillingness to accept Saddozai's latest version of his pedigree at face value.

102 (1980). Perscrutation of the Refugee Act and its legislative history, however, dispels any reasonable doubt on this score. Neither the district director's discretionary decisions under the INS regulations, nor the regulations themselves, are in any way interdicted by, or inconsistent with, the provisions of the Refugee Act.

### A. *Parole and the Refugee Act*

In a nation built upon the bountiful fruits of wave after wave of immigration, it is surprising to find how little national attention had been focused on the development of an overall refugee program. In the culmination of a massive and long-standing effort to remedy this deficiency, Congress passed the Refugee Act of 1980. In so doing, a comprehensive refugee resettlement and assistance policy was established for the first time. S.Rep. No. 256, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S. Code Cong. & Admin.News 141. There were several aspects to this legislation. It embodied a new—and more expansive— meaning of the term "refugee," conforming to the United Nations Convention and Protocol Relating to the Status of Refugees. *Id.* at 154–55. For example, displaced persons and political prisoners were included within the broadened definition. *Id.* The Refugee Act also increased the annual limitation on regular admissions and created a streamlined procedure for dealing with emergency situations. *Id.* at 142. The bill established a consultation process and provided significant federal support for resettlement. *Id.* Each and all of these objectives may validly be viewed as having liberalized preexisting strictures.

Yet, there was plainly another (coequal) purpose of the Refugee Act: to eliminate the Attorney General's use of his parole authority as a regularly-travelled alternate route for entry into the United States. *See INS v. Stevic,* 467 U.S. 407, 425, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984) ("the primary substantive change Congress intended to make under the Refugee Act ... was to eliminate the piecemeal approach to admission of refugees previously existing under § 203(a)(7) and § 212(d)(5) [8 U.S.C. § 1182(d)(5) ]"); *Kashani v. Immigration and Naturalization Service,* 793 F.2d 818, 825–27 (7th Cir.1986) (same). *See also* 1 Gordon & Rosenfield, *supra,* § 2.24Aa. The role of the bill was authoritatively described in this way:

> [I]t places into law what we do for refugees now by custom, and on an ad hoc basis, through the use of the "parole authority" in Section 212(d)(5) [8 U.S.C. § 1182(d)(5) ] of the Immigration and Nationality Act.

S.Rep. No. 256, *supra,* 1980 U.S.Code Cong. & Admin.News at 141.

▬▬▬ The Refugee Act was intended to provide a procedure which would minimize the Attorney General's need to utilize his parole power as an informal vehicle to assure the admission of refugees. This aspect of the legislation was implemented through an addition to the parole statute, viz., 8 U.S.C. § 1182(d)(5)(B) (1982). Although the appellants do not appear to claim a right to parole based on § 1182(d)(5)(B), its addition to the parole statute as part of the Refugee Act, together with the concomitant legislative history, inform our understanding of the parliamentary will with regard to the former parole statute, now § 1182(d)(5)(A). The furlough provision added by the Refugee Act explicitly limited the Attorney General's authority in granting parole thereunder to *refugees.* The statute intoned:

> [T]he Attorney General may not parole into the United States *an alien who is a refugee* unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

8 U.S.C. § 1182(d)(5)(B) (emphasis supplied).

Although this amendment plainly restricted the Attorney General's powers under § 1182(d)(5) with regard to *refugees,* the pertinent archives of both the Senate

and House reflected an unambiguous wish to have that the parole authority stay exactly as it was vis-a-vis *nonrefugee aliens.* There is little room for guesswork as to the legislative intent. The Senate report, for instance, stated flatly that "[t]he Attorney General's parole authority under Section 212(d)(5) [8 U.S.C. § 1182(d)(5)] of the Immigration and Nationality Act remains unchanged." S.Rep. No. 256, *supra, reprinted in* 1980 U.S.Code Cong. & Admin.News at 157. The House Conference Report was equally direct: it acknowledged that the amendment did "not affect the Attorney General's authority under section 212(d)(5) of the Immigration and Nationality Act to parole aliens who are not deemed to be refugees." H.R.Rep. No. 781, 96th Cong., 2d Sess. 20, *reprinted in* 1980 U.S.Code Cong. & Admin.News 160, 162.

The only conclusion which can sensibly be drawn from the incorporation of § 1182(d)(5)(B) into the statute is that Congress was attempting to restore the parole authority to the narrow uses for which it was originally intended, that is, "for emergent reasons or for reasons deemed strictly in the public interest," 8 U.S.C. § 1182(d)(5)(A), and not to perpetuate—or further encourage—its employment as a discretionary floodgate for the admission of an alien tide.

Beyond arguing by implication, the appellants point specifically to the provisions of the Refugee Act of 1980 dealing with applications for asylum. Congress, for the first time, sought to engraft an asylum stipulation onto the immigration laws in order to ameliorate the arrangement for processing sanctuary claims sponsored by aliens who had actually arrived in the United States. S.Rep. No. 256, *supra, reprinted in* 1980 U.S.Code Cong. & Admin.News at 149. To accomplish this end, Congress directed the Attorney General to structure an application system along the following lines:

The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee....

8 U.S.C. § 1158(a) (1982).

The statute not only leaves the decision of whether to grant safe harbor in the first place to "the discretion of the Attorney General," *id.,* but also gives him the same wide authority in bringing asylum status to an end, that is, the Attorney General may withdraw the privilege whenever, in his discretion, he "determines that the alien is no longer a refugee...." 8 U.S.C. § 1158(b). The statute neither enlarged an alien's eligibility for asylum nor vested in him rights which were previously denied. It merely directed the establishment of a mechanism to handle asylum applications tendered by aliens physically present. Once that directive was accommodated—and the Attorney General did so when he promulgated detailed regulations setting forth procedures for such asylum applications, *see* 8 C.F.R. §§ 208.1–208.16—there remained few restrictions on administrative decisionmaking.

■ The Refugee Act of 1980 is completely silent on the parole issue vis-a-vis asylum seekers. If Congress had wanted all such applicants to be paroled, or had favored a presumption of parole eligibility, or had been inclined to vary the exercise of the Attorney General's parole authority with regard to asylum aspirants, Congress could (and doubtless would) have enacted such a rider. In this wise, the combination of the absence of any such provision, coupled with the Congress's explicit statements that the Attorney General's parole power under 8 U.S.C. § 1182(d)(5)(A) was not to change, leaves no doubt that the executive branch's discretion to grant or refuse parole with respect to asylum seekers survived the passage of the Refugee Act intact.

To sum up, there are clear indicia of a congressional desire to discourage any extravagant—or even generous—use of the Attorney General's parole authority in con-

nection with both nonrefugee and refugee aliens. The statutory scheme and the annals of the Congress manifest a design to restrict the employment of parole within close confines. The Refugee Act itself was meant to provide an orderly system for the admission of refugees that would replace the erratic, ofttimes improvident, use of the Attorney General's parole authority for the same purpose. It makes little sense to argue that a statute constructed to reduce both the haphazardness and the incidence of parole actually conferred what amounted to a right to insist upon parole coincident with the filing of any asylum application.

The Refugee Act of 1980 cannot sensibly be heard as a clarion call to parole on demand. Yet it is just this result that the appellants would have us reach—for if we were to hold that the district director's decision to deny parole impliedly conflicts with the right to apply for asylum, then it would follow, as the night the day, that every asylum applicant who deigns to ask must be furloughed. The application itself, without more, would trigger automatic parole and free access to America. Such a holding would lend encouragement to end runs around the punctilious methodology of the Refugee Act. Moreover, it would contravene the existing statutes and their legislative history. In the bargain it would work a *de facto* repeal of the sweeping discretionary authority long enjoyed by the Attorney General in the immigration field. Congress could not have intended to breach the nation's borders in such tergiversant fashion.

For these reasons, the appellants' contention that the facially legitimate denial of parole somehow contradicts their statutory right to apply for asylum is baseless. Entitlement to asylum (or, more accurately, to the opportunity to solicit asylum) is wholly separate from, and entirely independent of, the Attorney General's statutory authority to afford or refuse parole. The appellants

have received their chance to apply for asylum, and they have pursued this prerogative to its fullest. Indeed, they continue to exercise this right by prosecuting their appeals from the decisions of the administrative law judges who have uniformly recommended that they be denied asylum and deported. Even if these decisions stand, the appellants will have other avenues open to them. Under internal guidelines adopted June 27, 1983, the INS may again consider parole for these Afghanistanis after final deportation orders have been entered in the asylum proceedings. If exclusion is eventually decreed, but there are difficulties in enforcing departures (for example, if India or Pakistan refuse to readmit a petitioner), then

> aliens detained in exclusion proceedings for more than thirty days after a request for travel facilities to the Department of State, and in whose cases a final order has been entered, may be considered for parole....

*See* INS Detention Policy Guidelines in Exclusion Cases, June 27, 1983.[8]

Absent "emergent reasons" or the like, *see* 8 U.S.C. § 1182(d)(5)(A), nothing in the law mandates the appellants' release on parole pending a final resolution of their asylum requests—and nothing in the record before us suggests that they are entitled to such indulgence.

### B. *Other Alleged Inconsistencies*

Reconciliation of the provisions of the Refugee Act and of the parole statute in this commonsense manner does not, however, end this phase of our inquiry. The petitioners offer several other supposed bases upon which they claim that the Refugee Act undercuts the legality of their continued detention. Some of these theories merit added comment.

 The appellants argue at length that the INS, whatever its stated reasons for detaining asylum applicants, is in reality employing quarantine as a form of coer-

---

**8.** Throughout these periods, of course, the appellants will have the added chance—as others have done with some success in the past—to

seek relief by means of special bills passed by the grace of the Congress.

cion in an impermissible attempt to force asylum seekers to abandon the prosecution of their applications. In their view, such coercion countermands the aims and entitlements of the Refugee Act, is punitive in its essence, and is fundamentally unfair to boot. But, this argument topples of its own weight. As we have mentioned repeatedly, the intention of the government is to protect our shores against a wave of itinerant asylum seekers bent on circumventing the coherent scheme of the Refugee Act, not to punish aliens for seeking asylum.

These cases testify eloquently to the core element of the problem. After all, these four petitioners were detained *before* they became applicants for asylum. Moreover, if they had resorted not to self-help, but to the regular procedures envisioned by the Refugee Act itself, their applications for admission would have been considered without the occasion or the need for any interim detention. Seen in this light, the plea that the appellants are being "punished" rings hollow. They have, at all times, had the option to return to the countries which they used as springboards in their efforts to reach the United States.[9] They were detained only when the government was forced, by their voluntary actions, to exercise its conceded authority to hold them pending inspection of their bona fides. Just as the disability of pretrial detention does not amount to "punishment" in the constitutional sense, *Bell v. Wolfish*, 441 U.S. 520, 537–39, 99 S.Ct. 1861, 1873–74, 60 L.Ed.2d 447 (1979), neither does the disability incident to the justifiable temporary detention of excludable aliens. *Cf. Doe v. Gaughan*, 808 F.2d 871, 879 n. 9 (1st Cir.1986) (in civil commitment context, "often restrictions on freedom may resemble punishment, but that mere resemblance does not equate to ... unconstitutionally inflicted punishment").

■ Next the appellants assert that, even in the absence of some express statutory conflict, the 1982 INS regulations violate the Refugee Act of 1980 by attempting in a thinly-veiled way impermissibly to curtail asylum applications. This ipse dixit, too, is devoid of any substance. On their face, the regulations are valid. The Attorney General has been ceded authority by Congress—authority which he has properly delegated to the INS—to publish such regulations as he deems necessary to enforce the Immigration and Nationality Act. 8 U.S.C. § 1103 (1982); *see also* 8 C.F.R. § 2.1 (1986). Both the detention regulations, 8 C.F.R. § 235.3, and the parole regulations, 8 C.F.R. § 212.5, were enacted under the clearest statutory claim of right. *See* 8 U.S.C. § 1225(b) (1982) and 8 U.S.C. § 1182(d)(5) (1982), respectively.

For aught that appears of record, the INS has promulgated its regulations in apparent compliance with the imperatives of the Administrative Procedure Act. *Jean v. Nelson*, 727 F.2d at 962; *Ishtyaq*, 627 F.Supp. at 22. *See also* 8 C.F.R. §§ 212.5, 235.5; 47 Fed.Reg. 30,044 (proposed July 9, 1982), as amended, 47 Fed.Reg. 46,493 (Oct. 19, 1982). These regulations speak, loudly and distinctly, for themselves: their purport was not to curb asylum applications, but to secure this country's borders against a large flow of illegal immigrants (many of whom might not qualify for either refugee or asylum status). *See* 47 Fed.Reg. 30,044, *supra*. Even upon the most searching scrutiny, no impropriety appears.

The detention of undocumented or fraudulently documented aliens, with parole possible only in the Attorney General's discretion, undoubtedly discourages some aliens from trying to circumvent the orderly procedures of the Refugee Act. Yet, this is not the unmitigated evil which the appellants envision. Far from undermining the Refugee Act, the INS regulations encourage compliance with the immigration laws

**9.** If the ongoing administrative proceedings result in deportation orders, INS policy will not allow them to be remanded to a place where their lives are in imminent danger—and, if there is any truth to their filings, Afghanistan is such a place. Instead, they will be returned to India or Pakistan, where they enjoyed relatively safe haven (if not idyllic lifestyles, *see* text *ante* at 3–4) until they flew to New York.

and deter attempts to evade those laws. Asylum, which remains available to proper applicants (as determined by Congress and the Attorney General), is limited only insofar as persons might desire to employ it as a device to avoid the normal application process in an at-all-costs effort to achieve immigrant status. Neither the discretionary denial of parole nor the 1982 INS regulations transgress the letter (or for that matter, the spirit) of the Refugee Act of 1980. This aspect of the petitioners' challenge is unavailing.

▇ It is unnecessary for us to consider the appellants' remaining contentions with regard to the Refugee Act. Those arguments are either subsumed in the foregoing or are so jejune that they do not warrant discussion.[10]

## VII. THE NEED FOR EVIDENTIARY HEARINGS

Lastly, we turn to the question of whether these habeas petitioners were entitled to evidentiary hearings. The federal courts are vested with broad discretion in considering the propriety of habeas corpus relief. In the words of the controlling statute, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243 (1982). It is, however, a bedrock principle that habeas redress concerns only the legality of the custody. *McNally v. Hill, Warden,* 293 U.S. 131, 139, 55 S.Ct. 24, 27, 79 L.Ed. 238 (1934); *Pierre v. United States,* 525 F.2d 933, 935–36 (5th Cir. 1976); 2 Gordon & Rosenfield, *supra,* at § 8.7h. *See also Matter of Ghalamsiah,* 806 F.2d 68, 72 n. 4 (3d Cir.1986) (habeas

petitioner, seeking enlargement upon bail while stay of deportation in effect, must "show that his detention was illegal to begin with, a prerequisite for habeas corpus relief"). Even in the criminal law, where the Constitution provides many more procedural safeguards than are afforded in the course of exclusion proceedings, the availability of habeas relief depends upon proof that the applicant's detention violates the law. *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); *McNally, supra.* And, entitlement to an evidentiary hearing requires a demonstration that a full and fair exposition of the facts was not had in the state court. *Harris v. Nelson,* 394 U.S. 286, 291, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1969); *Townsend,* 372 U.S. at 312, 83 S.Ct. at 756. "In all other cases ..., the holding of such a hearing is in the discretion of the district judge." *Id.* at 318, 83 S.Ct. at 759.

In immigration matters, the scope of judicial review on a petition for habeas corpus is more truncated than in the criminal context. In deportation hearings, for example, judicial oversight is customarily limited to the administrative record. 2 Gordon & Rosenfield, *supra,* at § 8.7g. The statute providing for review of deportation orders, 8 U.S.C. § 1105a(a)(4) (1982), explains that, except where a genuine issue of material fact has arisen regarding the petitioner's nationality,

... the petition shall be determined solely upon the administrative record upon which the deportation order is based and the Attorney General's finding of fact, if supported by reasonable, substantial,

---

**10.** One further point is worthy of brief mention. The appellants say that the incarceration of Saddozai and Mohibi violates the United Nations 1967 Protocol and Convention Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. 6577 (as incorporated in the Refugee Act of 1980). This argument has been made and rejected before. *See Pierre v. United States,* 547 F.2d 1281, 1288 (5th Cir.1977) ("accession to the Protocol by the United States was neither intended to nor had the effect of substantively altering the statutory immigration scheme.") In *Singh v. Nelson,* after a lengthy review of the debates surrounding the adoption of Article 31 of the Protocol,

the district court concluded that the Protocol was not intended to prevent a government from detaining one who attempted to enter illegally, pending a final decision as to whether to admit or exclude the person. 623 F.Supp. at 561. The district court also found that the drafters of the Protocol contemplated detention of an alien in aid of legitimate efforts to investigate the circumstances of his arrival. *Id. See also Pierre,* 547 F.2d at 1288 ("no new rights or entitlements were vested in [asylum] petitioners by operation of the Protocol"). We find this analysis to be not only persuasive, but entirely dispositive of this aspect of the petitioners' cases.

and probative evidence on the record considered as a whole, shall be conclusive.

The circumstance that the present cases involve exclusion proceedings rather than deportation proceedings militates strongly in favor of further circumscription of the claim to an evidentiary hearing. As we have already remarked, *see* text *ante* at 10–11, *deportable* aliens are properly accorded a broader panoply of rights than *excludable* aliens. *See Landon v. Plasencia,* 459 U.S. at 25–27, 103 S.Ct. at 325–26. Inasmuch as judicial oversight of deportation efforts does not habitually involve de novo evidentiary hearings, we see no reason to establish a custom and practice requiring such hearings in a district court's habeas review of detentions undertaken incident to exclusion proceedings. The petitioners have been unable to point to any respectable authority in support of their position, and our independent research has revealed none. As stated by two of the leading writers on immigration law, habeas corpus "cannot be utilized to review a refusal to grant collateral administrative relief, unrelated to the legality of custody." 2 Gordon & Rosenfield, *supra*, at § 8.7h. And, we will not permit it to be used in such an unauthorized manner.

In the cases before us, the appellants have not shown that their detention violates the law. They have not shown that any of them were denied impartial hearings on an agency level. We have carefully examined the copious administrative record and find substantial evidence therein to support the detention orders—evidence which, in light of the commodious discretion vested in the district director, appears ample to sustain the directives. The petitioners have been unable to point to any credible reason justifying departure from the ordinary course or presenting some special need to take testimony.

We will not lightly inundate the district courts with makework hearings. These appellants were lawfully detained and remanded to administrative custody. The continuing legality of that custody has not been brought into any serious question. On the record before us, the district court was not obliged to grant evidentiary hearings.

## VIII. CONCLUSION

We conclude that these appellants have been, and are, legally detained; that none have been wrongfully deprived of parole; that the penumbras of the Constitution have not been breached; and that the INS, in administering its powers vis-a-vis excludable aliens, has not violated the Refugee Act of 1980. We further conclude that the INS's current parole regulations are valid on their face and rationally related to the accomplishment of the Service's legitimate mission. And, the petitioners have failed to sustain the burden of showing that the district director abused his considerable discretion in any way.

We have scrupulously inspected the record and find that none of the grounds urged by the appellants (including but not limited to those discussed herein) has sufficient legal force to carry the day. We hold, as well, that none of the appellants, as a matter of right, was entitled to an evidentiary hearing in the district court. Each petitioner received all the process that was his due, administratively and in the court below. It follows inexorably, therefore, that all three of the district judges involved correctly denied the petitions for habeas corpus relief. There is no principled way that the judgments below can be disturbed. Thus we resolve the legal questions implicated in these appeals. The more difficult human problems remain.

We sympathize with the petitioners, and others like them, in their desire to reach this promised land and to remain here. We abhor the temporary hardships they must endure. We recognize that Congress (save only for the occasional passage of a special bill, *see ante* p. 14 n. 8) has delegated the uniquely political decisions about the ultimate admission and exclusion of aliens to the executive branch and that the INS must pull the laboring oar in determining the fate of the pending asylum applications. Yet we are reminded once again

that irony is no stranger to the law: these Afghan refugees came seeking freedom and the opportunity for a better life; they have achieved only detention and uncertainty about their destiny.

The petitioners' situation is as poignant as it is unfortunate—but its root causes lie in the choice that these young men consciously make. Having the option to remain in, or return to, India or Pakistan— where they were free in name, though arguably imprisoned by poverty and fear— they choose instead temporary imprisonment in a land far from home, in the hope of (eventually) attaining genuine freedom within our borders. They are close to liberty of the most meaningful kind, yet thus far they have been unable to grasp it.

Cases like these accentuate the marked tension between the ideals and symbols of America, on the one hand, and the (sometimes harsh) reality of the rule of law, on the other hand. It is, however, apodictic that neither the United States nor any other country can be all things to all people. Congress faces the unenviable task of deciding who, among all who would enter, can enter. The Refugee Act of 1980 is a manifestation of a national commitment to continue to admit persons displaced from foreign lands. It is no accident that "the United States refugee program ... in the last eight years has accepted more refugees for permanent resettlement than the rest of the world combined." Sen. Alan K. Simpson, *The Immigration Reform and Control Act: Immigration Policy and the National Interest,* 17 U.Mich.Jour. of Law. Ref. 147, 158 (1984). This is a healthy sign: the rich and continuing diversity of our nation depends on our ability to fulfill this commitment.

Nevertheless, there are limits. If we are to continue to absorb refugees and asylum applicants in meaningful numbers, both the actuality and the perception of equity must persist: we must have fair rules and we must administer them fairly. By the same token, those who wish to make the United States their home must themselves fairly abide by the system and its procedures.

Each applicant who puts himself above the law not only jeopardizes the process, but also threatens to usurp a place which should be filled by an aspiring immigrant who has demonstrated a willingness to play by the rules. Sanctuary cannot be built solidly upon such porous foundations.

*Affirmed.*