**AMANULLAH and Wahidullah, Petitioners,**

v.

**Charles T. COBB, as District Director of the Boston District of the Immigration and Naturalization Service, Respondent.**

Civ. A. No. 87–1195–T.

United States District Court, D. Massachusetts.

May 28, 1987.

Arthur Helton, Lawyers Committee for Human Rights, New York City, Regina Lee, Legal Services Center, Jamaica Plain, Mass., for petitioners.

Evan Slavitt, Asst. U.S. Atty., Boston, Mass., for respondent.

## MEMORANDUM

TAURO, District Judge.

This is a Petition for Writ of Habeas Corpus brought by two Afghan nationals who unsuccessfully applied for political asylum in the United States[1], and who now face exclusion and deportation[2] to India under the provisions of 8 U.S.C. §§ 1225 and 1226. Petitioners accept that they are subject to deportation. But they insist that, prior to their deportation, the Immigration and Naturalization Service (INS) must obtain assurances from the government of India that they will be accepted there, and not returned to Afghanistan where their lives would be in danger. To date, INS has refused to seek such assurances. As a consequence, petitioners allege INS is in violation of the Immigration and Nationality Act, specifically 8 U.S.C. § 1227(a) (1982)[3].

## I

## BACKGROUND

Petitioners are twenty-two year old citizens of Afghanistan who fled their country to India in 1983, after they were imprisoned by Afghan authorities for participating in anti-government demonstrations. In 1985, they departed India for Canada where they hoped to be granted political asylum. En route to Toronto, their plane made a stopover in New York City. They

---

1. For a comprehensive history of petitioners' case, see Judge Selya's opinion in *Amanullah v. Nelson,* 811 F.2d 1 (1st Cir.1987), from which many of the facts recited in this opinion are drawn.

2. Deportation has been stayed pursuant to a temporary restraining order issued by this court on May 11, 1987, and extended by further order of the court on May 21, 1987.

3. That section states, in relevant part:
 (1) Any alien ... who is excluded under this chapter, shall be immediately deported ... unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper. Deportation shall be to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States....
 (2) If the government of the country designated in paragraph (1) will not accept the alien into its territory, the alien's deportation shall be directed by the Attorney General, in his discretion and without necessarily giving any priority or preference because of their order as herein set forth, either to—
 (A) the country of which the alien is a subject, citizen, or national;
 (B) the country in which he was born;
 (C) the country in which he has a residence; or
 (D) any country which is willing to accept the alien into its territory, if deportation to any of the foregoing countries is impracticable, inadvisable, or impossible.

were detained there by INS officials, because of questionable travel documents. For administrative reasons, they were later transferred to an INS detention facility here in Boston, where they remain confined.

On December 20, 1985, petitioners filed for political asylum under 8 U.S.C. § 1158, and for withholding of deportation to Afghanistan under 8 U.S.C. § 1253(h). Those petitions were denied on September 22, 1986, and the denials were later appealed to the Board of Immigration Appeals.

In a letter dated March 9, 1987, (Appendix A) the INS represented to petitioners' counsel that petitioners would not be returned to Afghanistan if they withdrew their appeals. Subsequently, petitioners did withdraw their appeals, thereby subjecting themselves to immediate deportation. Petitioners' counsel, thereafter, was informed by INS that petitioners would be deported to India.

Later, in a letter dated May 6, 1987, (Appendix B) counsel was informed by the United Nations High Commissioner For Refugees (Commissioner)[4] that "the government of India does not allow the return of refugees ... [and] ... therefore [petitioners] might be at risk." According to the Commissioner, this admonition was passed on to INS officials in Washington and Boston. In a prior letter to counsel

dated November 26, 1985, (Appendix C) the Commissioner had stated:

> Because of the fact that for the past year no refugees have been returned to India from the U.S., ... [it] is unclear ... whether U.S. authorities are required to ascertain in advance the Indian Government's willingness to reaccept a particular refugee before he is, in fact, returned. In the light of what has occurred in the past, UNHCR New Delhi believes this to be essential if the risk of refoulement is to be avoided.

By letter dated May 5, 1987, (Appendix D), counsel requested that deportation be stayed until INS obtained assurances from the government of India that petitioners would be readmitted there, and that they would not later be returned by India to Afghanistan. INS denied the request. Petitioners, thereafter, brought this lawsuit.

## II

### THE LAW

Petitioners' claim is that the INS plan to deport them to India, without advance assurances that they will be accepted there, violates 8 U.S.C. § 1227(a). They assert § 1227 was amended in 1981 to track other statutory provisions that limit deportation to countries that agree in advance to accept and re-admit aliens.[5]

---

4. At a hearing before this court on May 21, 1987, counsel for the government indicated that the government does not contest the authenticity of the letters from the Commissioner, attached hereto as Appendices B and C.

5. The government, in addition to opposing petitioners' arguments on the merits, questions this court's jurisdiction to entertain a petition for writ of habeas corpus in this case. First, it asserts that since habeas relief is available only to redress unlawful custody, and the lawfulness of petitioners' custody was affirmed in *Amanullah v. Nelson*, 811 F.2d 1 (1st Cir.1987), this court cannot grant the relief petitioners seek.

It is true, of course, that habeas corpus exists to review the legality of official custody. With respect to these petitioners, the First Circuit has held only that it was not illegal for the government to confine them in detention centers while exclusion proceedings against them were pending. *Id.* It is a distinctly different type of custody, however, that is being challenged here. Specifically, the issue is whether the govern-

ment may lawfully confine petitioners to an airplane, bound for India, without prior assurances from Indian authorities that they will be accepted by India upon arrival. The government's intention to subject petitioners to this form of custody is, as counsel admitted at oral argument, resolute. Since the legality of this custody has not yet been decided, this court has jurisdiction to grant habeas relief.

The government further argues that petitioners' failure to exhaust administrative remedies, as required by 8 U.S.C. § 1105a(c), bars jurisdiction. The government concedes, however, that "[t]here is no provision wherein an alien can request a stay of deportation from the District Director when it has been mandated [as here] that the alien be excluded from the United States." Government's Memorandum of Law in Opposition to Petition for Habeas Corpus and for Dismissal of this Action, at 2. Thus, at this point, there is no administrative remedy to exhaust. Moreover, petitioners were induced to withdraw their prior appeal to the Board of

Under the existing provisions of § 1227(a)(1),

Deportation shall be to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States [i.e., the country of embarkation]....

In petitioners' case, that country would be India.

Section 1227(a)(2) goes on to provide that, if the country of embarkation "will not accept the alien into its territory", the Attorney General has four options. The first three involve choosing a country where the alien (A) is a subject, citizen or national, (B) was born or (C) has a residence. As applied to petitioners, each of these options would mean deportation to Afghanistan, a course of action the INS has committed itself not to follow.[6] The Attorney General's fourth and final option under the statutory scheme is (D), to deport the aliens to a country "which is willing to accept" them. *See* 8 U.S.C. § 1227(a)(2), *supra* note 3.

There are two basic questions before the court: (1) Does the phrase "willing to accept", set forth in the Attorney General's fourth option (§ 1227(a)(2)(D)), require advance assurance of acceptance?—and (2) if so, does that requirement of advance assurance apply as well to situations where the Attorney General seeks deportation (under § 1227(a)(1)) to the country of an excludable alien's embarkation?

In answer to the first question, the phrase "willing to accept" in (a)(2)(D) is straightforward. The word "willing" means "inclined or favorably disposed in mind." *Webster's Ninth New Collegiate Dictionary.* In order to determine whether a country is "inclined or favorably disposed" to an alien's arrival, common sense dictates that there has to be a prior inquiry —an advance assurance of acceptance.

As to the second question, the statute provides that excludable aliens shall be deported to the country of embarkation, unless that country "will not accept" them. The plain meaning of the phrase "will not accept" is the converse of the phrase "willing to accept", discussed above. In combination, they connote a Congressional intent to deport aliens only to countries that will accept them. Indeed, this country would have no authority to impose the return of an alien on an independent sovereign unwilling to accept him. It is inconceivable that Congress intended that there be a border confrontation in order to determine whether a target country is willing or unwilling to accept a putative deportee.

The legislative history of § 1227 supports this interpretation as well. In 1981, that section was amended, by adding subsection (a)(2). The result was a deportation procedure for *excludable* aliens intended to track the procedure dealing with *deportable* aliens under 8 U.S.C. § 1253(a), including its requirement of prior inquiry.[7]

Immigration Appeals—thereby failing to exhaust administrative remedies then available— by specific representations from the government regarding their deportation. *See* part I, *supra.* Penalizing petitioners under these circumstances would be inequitable, to say the least. Furthermore, in light of the INS's unequivocal position that it will not seek advance assurances from the target country before expelling excludable aliens, it clearly would have been futile for petitioners to continue to prosecute their appeal, solely to litigate this issue. *See Weinberger v. Wiesenfeld,* 420 U.S. 636, 641 n. 8, 95 S.Ct. 1225, 1230 n. 8, 43 L.Ed.2d 514 (1975) (exhaustion not required where government stipulated that administrative attack on statute construed by agency unfavorably to petitioners would have been futile); *Haitian Refugee Ctr. v. Civiletti,* 503 F.Supp. 442, 468–69 (S.D.Fla.1980) (exhaustion not required where

court believed INS would not have given petitioners' claims "serious consideration"), *aff'd in relevant part,* 676 F.2d 1023, 1033–36 (5th Cir. 1982).

6. *See* Appendix A.

7. Section 1253(a) states, in relevant part:

(a) ...

The deportation of an alien ... shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept him into its territory.... If the government of the country designated by the alien fails finally to advise the Attorney General within three months following original inquiry whether that government will or will not accept such alien into its territory, such designation may thereafter be disregarded. Thereupon deportation of such alien shall be directed to any

Relevant House and Senate Committee reports demonstrate a Congressional intent to establish a common procedure for both *excludable* and *deportable* aliens. The House Report observes that the amendment "provides the Attorney General with the same flexibility with respect to removal of aliens who are not permitted to enter the United States as it does, under Section 243(a) of the Act [8 U.S.C. § 1253(a)], in the case of aliens who have entered the United States and are subsequently deported." H.R.Rep. No. 264, 97th Cong., 1st Sess. 24, *reprinted in* 1981 U.S.Code Cong. & Ad.News 2577, 2593. The Senate Report states that the amendment "provides that aliens who are excluded from entry into the United States but who cannot be returned to the country 'whence they came,' may be sent to other countries as is the case with aliens who have entered the United States and are later deported." S.Rep. No. 859, 96th Cong., 2d Sess. 14 (1980).

Given the intent of the Congress to establish a consistent and common statutory procedure for both excludable and deportable aliens,[8] it is useful to examine how the issue of advance assurance has been interpreted in the context of deportable aliens. In the case of *United States ex rel. Tom Man v. Murff*, 264 F.2d 926 (2d Cir.1959), the INS sought to deport an alien to the People's Republic of China, after the country to which the alien had sought deportation refused to accept him. No prior inquiry as to acceptance had been made by INS. It was unknown, therefore, whether the alien would have been accepted when presented at the Chinese border. There, the government argued that for the court to require prior inquiry, under the circumstances of that case, would be to "invade the prerogative of the Executive Department." *Id.* at 928. Judge Hand, writing for the Second Circuit, disagreed, saying "... it would be to the last degree cumbersome and oppressive to shuttle an alien back and forth on the chance of his acceptance, when it was possible to ascertain the truth in advance by inquiry." *Id.*[9]

## CONCLUSION

This court is persuaded that Congress intended that the same standards of practicality and decency be applied in the cases of all aliens subject to deportation, regardless of the circumstances that brought

---

country of which such alien is a subject, national, or citizen if such country is willing to accept him into its territory. If the government of such country fails finally to advise the Attorney General or the alien within three months following the date of original inquiry, or within such other period as the Attorney General shall deem reasonable under the circumstances in a particular case, whether that government will or will not accept such alien into its territory, then such deportation shall be directed by the Attorney General within his discretion and without necessarily giving priority or preference because of their order as herein set forth either—
　(1) to the country from which such alien last entered the United States;
　(2) to the country in which is located the foreign port at which such alien embarked for the United States or for foreign contiguous territory;
　(3) to the country in which he was born;
　(4) to the country in which the place of his birth is situated at the time he is ordered deported;
　(5) to any country in which he resided prior to entering the country from which he entered the United States;
　(6) to the country which had sovereignty over the birthplace of the alien at the time of his birth; or

　(7) if deportation to any of the foregoing places or countries is impracticable, inadvisable, or impossible, then to any country which is willing to accept such alien into its territory.

**8.** As Judge Selya has pointed out, *excludable* aliens are afforded fewer rights and less protection than *deportable* aliens. *See Amanullah*, 811 F.2d at 10–11. But, with respect to the narrow issue of advance assurance of acceptance by a target country prior to deportation, Congress intended that the same treatment be afforded both categories of aliens.

**9.** The case of *Walai v. United States Immigration and Naturalization Service*, 552 F.Supp. 998 (S.D.N.Y.1982), and unpublished decisions cited by the government relying upon *Walai*, are unpersuasive. In *Walai*, the court expressed its belief, without discussing the significance of the 1981 amendment, that advance acceptance was not required before deporting excludable aliens under § 1227(a). But, given the fact that the petitioner in *Walai* was being deported under a procedure that guaranteed either acceptance by the target country or return to the United States, the court's comment arguably was dicta. Furthermore, the *Walai* court placed heavy reliance on *United States ex rel. Tom We Shung v. Esperdy*, 274 F.2d 667 (2d Cir.1960), a case decided many years before the amendment.

them to these shores. To put petitioners on a plane and then "see what happens", in terms of acceptance by India, would be an unduly oppressive process having no practical benefit to this country.

Petitioners committed no crime while in the United States. They merely wanted to be here. Who can blame them? Clearly, they went about entry the wrong way. But, mere administrative convenience is insufficient justification for processing their departure with less consideration than is afforded resident aliens who may have been deported after having committed a serious crime.[10]

This court holds that advance assurance of acceptance is required under the exclusion statute, and the INS is ordered to undertake appropriate inquiry of the Indian government prior to arranging for petitioners' deportation there.

An order will issue.

### ORDER

For the reasons set forth in the accompanying memorandum, respondent is hereby ordered to stay deportation of petitioners until respondent notifies the court that he has requested and received from the government of India, pursuant to INS Operations Instruction OI 243.1c, advance assurance that, upon arrival in India, petitioners will be accepted into Indian territory.

It is so ordered.

### APPENDIX A

U.S. Department of Justice

*Immigration and
Naturalization Service*

*John Fitzgerald Kennedy
Federal Building*

*Government Center*

*Boston, Massachusetts 02203*

PLEASE REFER TO THIS
FILE NUMBER

A27 503 252

A27 503 001

March 9, 1987

The Legal Services Center
Centro de Servicios Legales
3529 Washington Street
Jamaica Plain, MA 02130
Dear Ms. Lee:

This is in response to your February 13, 1987 letter regarding the possible withdrawal by your above-referenced clients of the immigration judge's denial of their applications for political asylum and withholding of deportation. Under 8 C.F.R. 3.4 (1987) withdrawal of their appeals would render final the Judge Ragno's decision ordering them excluded and deported from the United States. Section 237(a)(1) of the Immigration and Nationality Act (as amended by P.L. 97–116 1981) provides that any alien arriving in the United States who is excluded under the Act shall be immediately deported "... to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States ..."

If the government of the country designated in Section 237(a)(1) will not accept the alien into its territory, his deportation ... "shall be directed by the Attorney General, in his discretion and without necessarily giving any priority or preference because of their order as herein set forth either to:

(A) the country of which the alien is a subject citizen or national

(B) the country in which he was born

(C) the country in which he has a residence, or

(D) any country which is willing to accept the alien into its territory if deportation to any of the foregoing countries is impractical, inadvisable, or impossible."

I would, of course, follow these statutory requirements in effecting the departure of your clients from the United States. However, as you are aware, Attorney Michael P. Lindemann of the Office of Immigration Litigation has represented to the First Circuit Court of Appeals in your clients' habeas action, that the Service would not return

---

**10.** Under various circumstances, a resident alien "convicted of a crime involving moral turpitude" is subject to deportation, under the procedures of § 1253(a). *See* 8 U.S.C. § 1251(a)(4).

them to Afghanistan. That is our position and we intend to honor it.

If they are not accepted into any of the applicable countries remaining under Section 237(a)(1) and (2) and are returned to the United States it is Service policy to consider for parole aliens detained in exclusion proceedings for more than thirty days after a request for travel facilities has been made to the Department of State (Please see Detention Policy Guidelines in Exclusion Cases, June 27, 1983, of which I have attached a copy). I believe it is premature to discuss any further details of your clients' departure from the United States.

In my letter to you dated September 30, 1986, I informed you of my willingness to return your clients to Boston for any required court appearances. Your request to have them returned here for consultation does not fall within this category and I do not feel it prudent to expend government funds for their return at this time. If, as I stated before, you have any difficulty in getting in contact with your clients, please inform me so that action may be taken.

Sincerely,

Charles T. Cobb
District Director

## APPENDIX B

UNITED NATIONS HIGH
COMMISSIONER FOR
REFUGEES

HAUT COMMISSARIAT DES NATIONS
UNIES POUR LES REFUGIES

BRANCH OFFICE FOR THE UNITED
STATES OF AMERICA

1718 CONNECTICUT AVENUE, N.W.

WASHINGTON, D.C. 20009

BUREAU POUR LES ETATS UNIS
D'AMERIQUE

CABLE: HICOMREF
WASHINGTON D.C.

TELEX: 64406 HICOMREF

TELEPHONE: (202) 387–8546

6 May 1987

Dear Ms. Lee,

As per our conversation yesterday, I am writing with regard to your clients Mr.

Aminullah and Mr. Wahidullah, presently in INS detention in Boston.

These Afghan-detainees are known to our Office in India, and we have received a recent cable from our Office expressing concern about their possible deportation. According to the cable the government of India does not allow the return of refugees. Therefore, they might be at risk. We have discussed our concern with Immigration and Naturalization officials in Washington and Boston.

Yours sincerely,

Patricia W. Fagen
Legal Advisor

## APPENDIX C

UNITED NATIONS HIGH
COMMISSIONER FOR
REFUGEES

HAUT COMMISSARIAT DES NATIONS
UNIES POUR LES REFUGIES

BRANCH OFFICE FOR THE UNITED
STATES OF AMERICA

1718 CONNECTICUT AVENUE, N.W.

WASHINGTON, D.C. 20009

BUREAU POUR LES ETATS UNIS
D'AMERIQUE

CABLE: HIGOMREF
WASHINGTON D.C.

TELEX: 64406 HICOMREF

TELEPHONE: (202) 387–8546

26 November 1985

Mr. Arthur Helton

Director

The Lawyers Committee for

International Human Rights

36 West 44th Street

New York, NY 10036

Re: *Deportation of Afghans and Iranians from the United States to India* 600.-IND; 641.USA

Dear Mr. Helton:

This is further to our letter of 4 October 1985 concerning the readmission to India of Afghan refugees returned there from the United States.

Our office in New Delhi advised us recently that generally it remains Indian Government policy not to readmit refugees who have left India unless they have valid travel documents and entry visas. Despite this general policy, however, many refugees have been able at least to re-enter India after being sent back while in the course of their illegal global travels. Some have been permitted to re-enter without difficulty, but others have been arrested and charged with the forgery of travel documents.

With respect specifically to those returned from the U.S., the American Embassy in New Delhi notes the existence of an informal understanding between the U.S. and India which permits re-entry of refugees who leaving India had attempted to enter the U.S. illegally, if they had actually resided previously in India and/or are holders of refugee certificates issued by the UNHCR office in New Delhi. It is understood, however, that the American Embassy has advised the U.S. Immigration Service to send Afghan and Iranian refugees to New Delhi only, and not to any other Indian port of entry where immigration officers might not be as well briefed on this score.

Because of the fact that for the past year no refugees have been returned to India from the U.S., we do not know how this understanding might actually work out in practice. It is unclear, for instance, whether U.S. authorities are required to ascertain in advance the Indian Government's willingness to reaccept a particular refugee before he is, in fact, returned. In the light of what has occurred in the past, UNHCR New Delhi believes this to be essential if the risk of refoulement is to be avoided.

Finally, it is emphasized that our principal concern here is to ensure that refugees who had found protection in India before their attempt to enter the U.S. illegally can be returned safely there and do not end up in orbit or do not face refoulement. UNHCR in New Delhi reports that in 1984 there were two cases of refoulement to Afghanistan from New Delhi airport where the refugee in each instance had just been returned by countries into which he had sought illegal entry. In another instance which occurred a few months ago two Iranian refugees, who had been returned to Bombay from abroad, were on the point of being refouled to Iran when the action was halted. These incidents underscore the need for a procedurally precise accord which will obviate the risk of refoulement. We trust that this recent understanding between the U.S. and India will provide these essential safeguards.

Sincerely,
Joachim Henkel
Deputy Representative

## APPENDIX D

### THE LEGAL SERVICES CENTER

Centro de Servicios Legales

3529 WASHINGTON STREET

JAMAICA PLAIN,
MASSACHUSETTS 02130

(617) 522-3003

May 5, 1987

Charles Cobb

District Director

Immigration and Naturalization Service

JFK Federal Building

Government Center

Boston, MA

Re: Amanullah A27 503 252
 Wahidullah A27 503 001

Dear Mr. Cobb:

Please consider this letter and supporting documents as a request for a stay of exclusion of the above-named, pursuant to section 237(a) of the Act, and 8 C.F.R. s. 237.

Last Thursday, I was informed by Trial Attorney Rick Neville that a request for travel facilities for the applicants was made by the Service to the State Department on April 17, 1987, and that the applicants would be deported to India via Bombay on May 6, 1987. It is my understanding that there has not been any official confirmation from the government of India that the applicants would be readmitted to that country upon their expulsion from the United States. On Friday, I was informed by Mr. Swashbawan Singh of the Indian Embassy that no decision has been made by his government regarding the re-entry of these applicants.

This morning, I learned from Mr. Duncanson that the plans for return of the applicants on May 6 have been postponed. I further understand that the Service now seeks to execute the applicants exclusion orders by sending them unescorted on a TWA flight to New Delhi rather than Bombay, as soon as travel arrangements can be confirmed with the air carrier.

As you are probably aware of by now, the United Nations High Commissioner for Refugees has formally requested the Service not to return the applicants to India at all, based on the fact that there is a substantial risk that the applicants will be involuntarily refouled to Afghanistan. I have been informed by Ms. Patricia Fagen from the Washington office of the UNHCR that a request has been made by its New Delhi office to avert applicants' return to India. I understand that Ms. Fagen has presented this request to you by telephone. I am enclosing for your review a copy of a November 1985 letter from the office of the UNHCR on the risks faced by Afghan refugees who are returned to India without prior assurances of acceptance to that country. I am also submitting for your consideration a report prepared by the Lawyers Committee for Human Rights regarding the problem of "refugees in orbit" who are unable to find any countries which are willing to accept them for asylum.

In your letter to me dated March 9, 1987, you stated that it is the government's position not to return these applicants to Af-ghanistan. I can only assume that, pursuant to section 237 of the Act, the Service will first seek to deport applicants to India, and failing that, will deport them to any other country which is willing to accept the applicants.

I am requesting that you stay applicant's expulsion until you have obtained advance assurance from the government of India that the applicants would in fact be accepted. Under the terms of Section 237 of the Act, an excludable alien may not be expelled to a foreign country unless that country first agrees to accept him or her. The statute makes this clear when it lists the possible places of deportation. Section 237(a)(2) states:

If the government of the country designated in paragraph (1) [the country in which the alien boarded the vessel or aircraft on which s/he arrived in the United States] will not accept the alien into its territory, the alien's deportation shall be directed by the Attorney General, in his discretion and without necessarily giving any priority or preference because of their order as herein set forth, either to—

(1) the country of which the alien is a subject, citizen, or national;
(2) the country in which he was born;
(3) the country in which he has a residence;
(4) any country which is willing to accept the alien into its territory, if deportation to any of the foregoing countries is impracticable, inadvisable or impossible.

The plain meaning of this statute indicates that "acceptance" is an integral aspect of the expulsion process for an excludable alien. The words "willing to accept" would be superfluous unless prior to the time of expulsion, the Service determines that India has consented to receive the applicants.

Furthermore, in view of the concerns expressed by the UNHCR regarding the refoulement of the applicants back to Afghanistan should they be deported to India, I am requesting that you also obtain advanced assurances from the government of

India that the applicants will not be repatriated to Afghanistan upon their return to New Delhi. If the Service was to deport the applicants to India without such assurances, this procedure may result in the applicants forcible repatriation to Afghanistan, in contravention to your stated intention that the Service will not deport any Afghans to their home country.

I am also enclosing for your consideration a copy of a decision by Judge Constantino of the Eastern District of New York, which ordered the Service not to deport an Iranian refugee to India until it has been determined that India will accept the alien, and upon certification by the Service to the Court that the government of India will not deport the alien to Iran or Pakistan.

Lastly, I am requesting that I be afforded 48 hours actual notice of any attempt to effectuate the applicants departure to India or to any third country. I request that I be informed of the date of their departure, the name of the carrier, the flight number, the flight schedule, and any other specifics relevant to their departure.

I would greatly appreciate your written response to this request.

> Sincerely yours,
> Regina Lee
> Attorney for Applicants

Enclosures