AMANULLAH AND WAHIDULLAH,
Petitioners, Appellees,

v.

Charles T. COBB, etc.,
Respondent, Appellant.

No. 87–1695.

United States Court of Appeals,
First Circuit.

Heard Feb. 1, 1988.
Decided Nov. 22, 1988.

Joseph F. Ciolino, Office of Immigration Litigation, Civ. Div., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Civ. Div., and Richard M. Evans, Asst. Director, Washington, D.C., were on brief, for respondent, appellant.

Arthur C. Helton, Lawyers Committee for Human Rights, New York City, with whom Regina Lee, Legal Services Center, was on brief, for petitioners, appellees.

Before COFFIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

The issue presented on appeal is whether and to what extent the Attorney General has discretion to deport excludable aliens under 8 U.S.C. § 1227(a). The district court held that advance written assurance of acceptance of the petitioners in this case by the government of India was required by § 1227(a)(2). The panel majority follows a different route, giving the government the option of voluntarily obtaining advanced assurances and, failing exercise of such option, vacates the judgment and

* Of the District of Rhode Island, sitting by designation.

remands the case for the reinstitution of an appeal under 8 U.S.C. § 1253(h).

## Facts [1]

Appellees are Afghan refugees. In 1983, appellees fled from Afghanistan to New Delhi, India, after they were imprisoned by the Afghan authorities for participating in anti-government demonstrations. Joint Appendix, 139.

In the fall of 1985, appellees were assisted by a "travel agent" with arrangements for them to travel to Canada, where they hoped to be granted political asylum. On November 22, 1985, they departed from the airport in Bombay, India.[2] When the plane from Bombay made a stopover in New York en route to Toronto, appellees were detained by the Immigration and Naturalization Service [hereinafter INS] because of the lack of valid travel documents. Appellees were detained initially at the Service Processing Center in New York City and, apparently because of space limitations, they were then transferred to the INS detention facility in Boston. Id. at 139–40.

On December 20, 1985, appellees filed applications before an immigration judge in joint exclusion proceedings for political asylum in the United States under 8 U.S.C. § 1158 and for withholding of deportation to Afghanistan under 8 U.S.C. § 1253(h). Id. at 140. On September 22, 1986, the immigration judge rendered an oral decision denying appellees' applications for political asylum and withholding of deportation, despite advisory opinions from the Bureau of Human Rights and Humanitarian Affairs of the Department of State, rendered pursuant to 8 C.F.R. § 208.10 (1986), which stated that appellees could have a well-founded fear of persecution upon return to Afghanistan. Id. at 4–5.

On September 22, 1986, appellees appealed the immigration judge's denial of asy-

lum and withholding to the Board of Immigration Appeals. Id. at 140. In a prior habeas proceeding on unrelated grounds brought by appellees, appellant represented to this court that the government will not return appellees to Afghanistan. Appellant reaffirmed this position in a March 9, 1987 letter to appellees' counsel. Id. at 140, 149. In reliance upon appellant's representation that they would not be returned to Afghanistan, and hoping to gain release, appellees withdrew their appeals to the Board of Immigration Appeals on March 30, 1987, thus rendering administratively final the immigration judge's order of exclusion and immediate deportation under 8 U.S.C. § 1227. Id. at 140.

On April 30, 1987, appellant informed appellees' counsel that a request for "travel facilities" for appellees had been made by the INS to the State Department on April 17, 1987, pursuant to a 1983 INS guideline providing for release on immigration parole in cases where there exist difficulties in enforcing departure to third countries for aliens who are under final orders of exclusion. Id. at 60. However, appellees' counsel was informed that appellees would be deported to India.

Shortly thereafter, in May 1987, appellant was warned by the United Nations High Commissioner for Refugees [hereinafter UNHCR] that the Indian government would not allow the appellees' return.[3] Id. at 64, 140, 151. According to the UNHCR, Afghan refugees who are returned without advance assurance of the Indian government's willingness to accept them are at risk of refoulement to Afghanistan. Id. at 140, 151. In a prior letter to appellees' counsel dated November 26, 1985, the Commissioner had written:

[It] is unclear ... whether U.S. authorities are required to ascertain in advance the Indian government's willingness to

---

1. The following statement of the facts draws heavily on appellees' statement thereof which we find consistent with our own independent reading of the record.

2. The factual background of appellees' flight is described in *Amanullah v. Nelson,* 811 F.2d 1 (1st Cir.1987).

3. At a hearing in the District Court on May 21, 1987, counsel for appellant indicated that appellant does not contest the authenticity of the High Commissioner's letters. *Id.* at 140, 151–53.

reaccept a particular refugee before he is, in fact, returned. In the light of what has occurred in the past, UNHCR New Delhi believes this to be essential if the risk of refoulement is to be avoided.

*Id.* at 152–53.

On May 5, 1987, appellees requested appellant to stay their deportation until such time as the INS could obtain advance assurances that the government of India would consent to their admission, and that appellees would not be returned by India to Afghanistan. *Id.* at 64, 141. Appellees' request for a stay of deportation was denied on May 11, 1987 by appellant, *id.* at 141, who at that time planned to return appellees on May 12, 1987 by sending them unescorted on an air carrier to India.; *Id.* at 66. Appellant had not obtained advance assurance of the Indian government's willingness to accept appellees.

On May 11, 1987, appellees filed a petition for writ of habeas corpus and a motion for a temporary restraining order. On the same day, the District Court enjoined appellant from deporting appellees to India until appellant obtained prior assurance that India will accept appellees and will not return them to Afghanistan.

Appellees received a letter from UNHCR dated May 13, 1987, informing them that UNHCR had received a second cable from its office in India which reiterated its concern about the possibility of refoulement to Afghanistan. The letter further stated that its office in India had "cited previous cases and noted that UNHCR's involvement in the case was unlikely to influence how the case is handled." *Id.* at 92.

On May 20, 1987, appellant filed a motion to dismiss the petition for writ of habeas corpus and request for injunctive relief, and a supporting memorandum of law. A.93–132. The District Court heard appellees' and appellant's arguments at a hearing on May 21, 1987 and issued its decision on May 28, 1987. *Id.* at 138–155. The District Court held that advance assurance of acceptance is required under 8 U.S.C. § 1227(a), and it ordered the INS to make the appropriate inquiry of the Indian government prior to making any arrangements for appellees' deportation to that country, 673 F.Supp. 28. *Id.* at 148. It is from this decision that the present appeal is taken.

We note one further fact not available to the District Court. In a letter dated May 18, 1987, appellant informed Mr. M. Iyer, a Counselor at the Embassy of India in Washington, D.C., of its intention to deport "Wahid Ullah" [sic] and "Aman Ullah" [sic] to India and requested that Mr. Iyer relay this information to his home office in India. *Id.* at 203. When appellant received no response to this letter from the Indian Embassy, appellant sent another letter to Mr. Iyer, dated July 10, 1987, making reference to the May 18, 1987 letter and again requesting that he relay its portents to his government. In a letter, dated July 23, 1987, to Assistant INS Commissioner Joan C. Higgins, which, having been received after the District Court's decision, is not a part of the formal record, N. Kubendran, Second Secretary in the Indian Embassy, Washington, D.C., stated that "[s]ince the above two AFGHAN nationals [Amanullah and Wahidullah] left India on their own volition, Government of India will not be in a position to accept them. We would also like to clarify that Government of India do [sic] not accept the theory of the so called 'country of first refuge obligation.'" Appellees' Brief, Addendum, A–8.

### Excludability Under § 1227(a)

Neither Amanullah nor Wahidullah contests their status as excludable aliens under 8 U.S.C. § 1182(a)(26). The Attorney General, having both properly determined their status pursuant to 8 U.S.C. § 1226 and detained them under 8 U.S.C. § 1225, now seeks to deport them. Section 1227 of Title 8 governs the deportation of excludable aliens.

Section 1227(a) regulates the determination of the location to which the excludable alien may be deported. This subdivision has two parts. Section 1227(a)(1) instructs the Attorney General in relevant part that "[d]eportation shall be to the country in which the alien boarded the vessel or aircraft on which he arrived in the United

States...." 8 U.S.C. § 1227(a)(1). Section 1227(a)(2) gives the Attorney General additional flexibility in determining where the alien may be sent "[i]f the government of the country designated in paragraph (1) will not accept the alien into its territory...." 8 U.S.C. § 1227(a)(2). In particular, this provision permits the alien to be sent to "(A) the country of which the alien is a subject, citizen, or national; (B) the country in which he was born; (C) the country in which he has a residence; or (D) a country which is willing to accept the alien into its territory, if deportation to any of the foregoing countries is impracticable, inadvisable, or impossible." 8 U.S.C. § 1227(a)(2).

The Application of § 1227(a) [4]

Under § 1227(a)(1), Amanullah and Wahidullah should be deported to India, the country from which they embarked for the United States, unless the Attorney General decides in his discretion that deportation to that country is impracticable or improper. Nonetheless, Section 1227(a)(2) expressly states that "[i]f the government designated in paragraph (1) will not accept the alien" then he must be sent to a country that belongs to one of four other enumerated classes. 8 U.S.C. § 1227(a)(2).

In effect, section 1227(a)(2) limits the permissible deportation of aliens to a country that is willing to accept them. Accordingly, the question arises whether under this provision the Attorney General must receive written verification of a country's willingness to accept the excludable alien. The lower court answered this question affirmatively; I agree.

Under a parallel provision for the deportation of deportable aliens, 8 U.S.C. § 1253(a), by virtue of which the alien is permitted to designate the country to which he is deported provided that the country designated is "willing to accept him," Congress required that there be prior inquiry to and assurance from that country that it was indeed willing to accept this

alien. Moreover, when Congress adopted the present provision of section 1227, it manifested its intent to establish a common procedure for both excludable and deportable aliens. *See* S.Rep. No. 859, 96th Cong., 2d Sess. 14 (1980) (amendment "provides that aliens who are excluded from entry into the United States but who cannot be returned to the country 'whence they came,' may be sent to other countries as is the case with aliens who have entered the United States and are later deported"); H.R.Rep. No. 264, 97th Cong., 1st Sess. 24 (1981), *reprinted in* 1981 U.S.Code Cong. & Admin.News 2577, 2593 (amendment "provides the Attorney General with the same flexibility with respect to removal of aliens who are not permitted to enter the United States as it does, under Section 243(a) of the Act [8 U.S.C. § 1253(a)], in the case of aliens who have entered the United States and are subsequently deported").

Given that Congress intended to establish a common procedure for both excludable and deportable aliens, Congress' requirement of willing acceptance by the country designated in § 1227(a)(1) becomes highly significant. Congress most likely intended that the same procedure for determining whether a country was willing to accept a deportable alien would be used for determining whether a country was willing to accept an excludable alien. Section 1227(a)(2) must require prior inquiry to and assurance from a country that it is willing to accept the excludable alien before that alien may be deported to that country.

Congress could not have intended to permit the United States government to engage in the practice of placing refugees in orbit: in flight from country to country, none willing to accept them. As Judge Learned Hand observed in *United States ex. rel. Tom Man v. Murff,* 264 F.2d 926 (2d Cir.1959), "it would be to the last degree cumbersome and oppressive to shuttle an alien back and forth on the chance of his acceptance, when it was possible to ascer-

**4.** This section represents the views of the writer. Judge Aldrich has filed a separate concurrence and Judge Coffin has also refrained from join-

ing this analysis of § 1227(a), resting his concurrence on the grounds of § 1253(h), discussed at pp. 367–368 *infra.*

tain the truth in advance by inquiry." *Murff*, 264 F.2d at 928.

Since the lower court's opinion, the Indian government has directly addressed the case of Amanullah and Wahidullah. In a letter concerning petitioners to the Department of Justice, the Indian government stated expressly that it did not accept the theory of the so-called "country of first refuge obligation" and that the Indian government will not readmit petitioners if the United States attempts to send them back. *See* Brief for Appellees, A–8. Because the Indian government has not given the requisite assurance, but instead has expressly written that it will not accept petitioners, Amanullah and Wahidullah must be sent to another country that meets one of the conditions stated in §§ 1227(a)(2)(A), (B), (C) or (D).[5] Accordingly, under § 1227(a)(2), petitioners cannot be deported to India unless the Indian government reverses its official position and states in writing both that it will accept petitioners and that petitioners will not be refouled to Afghanistan.

Regarding § 1227(a)(2)(A), (B), (C) and (D), the application of § 1227(a) is restricted by 8 U.S.C. § 1253(h). Omitting an inapposite parenthesis, § 1253(h)(1) states that "[t]he Attorney General shall not deport or return any alien … to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1). While this provision is limited by § 1253(h)(2), none of the four conditions set forth therein are applicable to the present case.

Section 1253(h), "provide[s] for withholding deportation of aliens to countries where they would face persecution, unless their deportation would be permitted under the U.N. Convention and Protocol Relating to the Status of Refugees … [or] unless any of four specific conditions [previously set forth] were met." H.R.Conf.Rep. No. 781, 96th Cong., 2d Sess. 20 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 141, 160, 161. Moreover, as the Senate Report accompanying the Refugee Act of 1980 makes clear, this restriction imposed by § 1253(h) is meant to apply to "the deportation of aliens who seek asylum in exclusion, as well as deportation, proceedings." S.Rep. No. 256, 96th Cong., 2d Sess. 17 (1979), *reprinted in* 1980 U.S.Code Cong. & Admin.News 141, 157.

As the Supreme Court notes in *I.N.S. v. Stevic*, 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), "the text of the statute simply does not specify how great a possibility of persecution must exist to qualify the alien for withholding of deportation." *Stevic*, 467 U.S. at 421–22, 104 S.Ct. at 2496–97. Nonetheless, the Court continues, "[t]o the extent such a standard can be inferred from the bare language of the provision, it appears that a likelihood of persecution is required." *Id.* at 422, 104 S.Ct. at 2496. Thus, as held by the Supreme Court, "[t]he question under that standard is whether it is more likely than not that the alien would be subject to persecution." *Id.* at 424, 104 S.Ct. at 2498.

Because § 1253(h) obviously applies to prevent the Attorney General from deporting petitioners to Afghanistan, neither can the petitioners be deported under 8 U.S.C. § 1227(a)(2)(A), (B) or (C). Thus, only § 1227(a)(2)(D) is available to authorize the deportation of the petitioners. Section 1227(a)(2)(D), however, also contains Congress' requirement of willing acceptance. Accordingly, for the reasons already stated with respect to the first occurrence of the willing acceptance requirement, I believe that § 1227(a)(2)(D) also requires prior inquiry to and written assurance from a

---

**5.** Counsel for the Government argues that the official expression by the Indian government of its sovereign will does not reflect India's *de facto* practice and, therefore, that it does not prove that the appellees would not be accepted by that country. We find it incredible that the officials of our own government could be so contemptuous toward the officials of another.

The continuing peace and future prosperity of the global community of nations demand and require that the official pronouncements of another sovereign nation be accorded the full faith and respect appropriate to sovereignty. Within a court of law official pronouncements by a government must be treated as dispositive of sovereign intent.

country that it is willing to accept the excludable alien before that alien may be deported to that country. Needless to say, such assurance has not been received from India in the present case and, therefore, appellees should not be deported to that country.

### The Application of § 1253(h)

 Although the above discussion of § 1227(a) represents only the writer's view, the majority of this panel holds that, on the record in this case, the government's assurance that it would not deport appellees to Afghanistan effectively prevents their deportation to India pending reinstatement and final disposition of their appeal from an adverse ruling of the immigration judge. As previously observed, the discretion of the Attorney General under § 1227(a)(2) is limited by § 1253(h). Section 1253(h) together with the standard of proof articulated in *Stevic* require that the Attorney General decide that deportation to a country is improper if the alien can show that there exists a likelihood that "such alien's life or freedom would be threatened in such a country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h). Accordingly, since appellees withdrew their appeal from the immigration judge's § 1253(h) decision only on the government's representation that they would not be returned to Afghanistan, they should be permitted to reinstate their appeal unless the government can obtain advance assurance that the appellees will be accepted and not sent to Afghanistan. In such a posture, it is quite possible if not likely that § 1253(h) would prevent deportation.

 The refoulement of a political refugee to a country from which he has escaped and to which he does not desire to return because of the danger it poses, is beyond doubt an interference with his life and liberty. We note, first, that if the Indian government sent petitioners back to Afghanistan that this would constitute an interference with petitioners' life and liberty at the very least on account of their nationality and that, therefore, the threat of such interference is a threat within the meaning of § 1253(h).

Given that § 1253(h) applies to petitioners' deportation, we consider the evidence adduced by petitioners that the Indian government threatens an interference with their life and liberty and determine if this evidence meets the standard of proof necessary to invoke § 1253(h). The petitioners have cited, *inter alia,* three communications from the United Nations High Commissioner for Refugees. The UNHCR is an expert on the status of refugees throughout the world. It has an office in India and has paid special attention to the position of Afghanistan nationals in India. In the opinion of the UNHCR, the petitioners would be at risk. To avoid refoulement to Afghanistan the UNHCR recommended that petitioners receive assurances in advance that they would not be returned to Afghanistan. The UNHCR referred to two cases of Afghanistan nationals that were returned by the Indian government to Afghanistan. Moreover, the UNHCR has been following the cases of Amanullah and Wahidullah and has been told specifically that in their cases "refoulement to Afghanistan is not excluded." Joint Appendix, Exh. E–3. Nor does the Bureau of Human Rights and Humanitarian Affairs of the Department of State think that this is an exaggeration. In an advisory opinion, issued pursuant to 8 C.F.R. § 208.10 (1986), the Bureau stated that petitioners could have a well-founded fear of persecution upon return to Afghanistan. *See* Joint Appendix, 5. Together with this evidence may be added the official communication of the Indian government stating that it would not accept the appellees and that it does not recognize the country of first refuge obligation. We believe that on these facts the *Stevic* standard would be met.

### Conclusion

Under the unique circumstances we conclude that, with the cooperation of the United States, we can bring about an equitable result by retaining jurisdiction subject to the following conditions. If, within

sixty days the United States obtains written assurances from the Indian government that it will accept petitioners and that they will not be subject to refoulement to Afghanistan, the judgment below will be set aside so that appellees may be sent to India. If, on the other hand, such written assurances have not been received within sixty days, the deportation of petitioners will be stayed pending reinstatement and final decision of their § 1253(h) appeal from the immigration judge. If such decision is favorable, the judgment below shall be vacated as moot. If such decision is adverse, the judgment below shall be vacated and deportation may then ensue. If, thirty days after receipt of notice by petitioners that they may reinstate their § 1253(h) appeal, no such action is requested, the judgment below shall be vacated and deportation may then ensue.

No costs.

COFFIN, Circuit Judge, concurring.

I join in the affirmance of the judgment below, essentially for the reasons expressed in Judge Pettine's opinion at pages 367–368.

It is a very difficult question whether and when prior notice is required under section 1227(a). The arguments on each side have much to commend them, but I believe that we are hampered by a certain congressional schizophrenia. As Judge Pettine notes, there is much in the legislative history indicating that Congress had some intention of making the deportation and exclusion proceedings parallel, at least in part. I agree that it is sheer folly to send an alien to another country without any indication that the country will receive the alien, or, as in this case, where there is explicit notice that it will *not* accept the individual. On the other hand, Congress did not make the two statute sections parallel, and it would have been very easy to duplicate the precise notification procedures of § 1253(a) in the text of § 1227(a). The omission of this detail cannot, as Judge Aldrich points out, be wholly insignificant.

But it is not merely a confusing statute that bedevils us. We are also confronted by confusion on the facts, insofar as we do not know precisely *how* § 1227(a) is implemented by the INS. I can envision at least four different scenarios in a case like the present one: (1) The alien is sent unescorted on a plane to India, India "refuses" to accept the alien and sends him back immediately on a plane to the United States; (2) The alien is sent unescorted on a plane to India, where he is transferred against his will to Afghanistan; (3) The alien is escorted to India by an INS official, who brings the alien back to the United States if India refuses to accept him; (4) The alien is sent to India, either escorted or unaccompanied, and India accepts the alien, despite its previous denials.

None of these options seem particularly appealing or practicable, and the second is plainly unacceptable. The record does not indicate which of these procedures is commonly employed or guaranteed. It is clear that if the alien is unaccompanied on his flight to the foreign country, there is no assurance that he will not be shunted off to another country, rather than accepted in the first country or returned to the United States for implementation of the alternatives listed in § 1227(a)(2). It does not make much sense to assume that Congress left this possibility open; such a result effectively would eviscerate the 1981 amendments reflected in § 1227(a)(2). But the INS has given us no assurance that it can guarantee that the alternatives will remain viable after it sends an excluded alien off to a country that has expressed an unwillingness to accept that individual.

We do not, however, need to resolve this conundrum in the present case where the record is so barren. Given what we know about India's posture toward these aliens, I believe that § 1253(h) prevents the deportation of these excludables back to India, for the reasons stated in Judge Pettine's opinion *supra* at 367–368. These aliens withdrew their appeal of the ALJ's denial of § 1253(h) relief only on the government's representation that they would not be returned to Afghanistan. If we were to reverse the district court in this case, the INS could circumvent this promise by send-

ing the aliens to India despite India's express intention not to accept them. Affirmance here will mean that either the INS will follow the alternative procedures of § 1227(a)(2), or the aliens will be permitted to reinstate their appeal of the ALJ's § 1253(h) decision. Therefore, I join in the judgment of affirmance, leaving for another day and a more illuminating record a decision concerning the precise scope of § 1227(a).

BAILEY ALDRICH, Senior Circuit Judge, concurring.

Although, for special factual reasons, I concur in the result, I disagree so vigorously with Judge Pettine's analysis, partially accepted by Judge Coffin, and the matter being of broad importance, I wish to record my thinking. Judge Pettine would, seemingly, impose upon the Attorney General the same precondition for rejecting an excludable alien as he must meet in order to deport one previously admitted. This, I believe, disregards both the substantive difference, and interests, between refusing admission to an illegal alien, and expelling one that is already here, and, what Judge Coffin refers to as a "detail," the fact that there are separate statutes, differently worded. That an alien, once here, should be afforded certain rights before expulsion makes a great deal of sense. That the Attorney General should be obliged to confer these same rights on one whose sole claim is that he has succeeded in presenting himself at the border, uninvited, and with no basis for entry, seems much less desirable, or needed. Rather than noting the substantive difference between the two types of aliens, and their circumstances, as well as the normal implication of differing statutory provisions, Judge Pettine seems at pains to achieve identical results. I think this a serious mistake.

Prior to the 1981 amendment to the exclusion statute, 8 U.S.C. section 1227, there was, concededly, no requirement that the Attorney General obtain the prior consent of the country from which the unadmitted alien had embarked before returning him thereto, although, as section 1253(a) provided, such consent was needed before deport-ing one already here. *United States ex rel. Tom Man v. Murff*, 264 F.2d 926 (2d Cir.1959). This difference was recognized by Judge Weinfeld, of the Southern District, who pointed out,

> The return of aliens who seek and who are denied admission into the United States is governed by the exclusion provisions, whereas the deportation of aliens who have already gained admission, whether legally or illegally, is governed by the expulsion provisions of the act. . . .

> The very fact that Congress spelled out in section 243(a) [8 U.S.C. § 1253(a)] the requirement of consent by the receiving country negates any contention that such requirement be read into section 237(a) [8 U.S.C. § 1227(a)] as a condition of exclusion.

*United States ex rel. Tom We Shung*, 176 F.Supp. 253, 256, 259 (S.D.N.Y.1959), *aff'd on opinion below*, 274 F.2d 667 (2d Cir. 1960). At that time section 1227(a) read as follows.

> (a) Any alien (other than an alien crewman) arriving in the United States who is excluded under this chapter, shall be immediately deported to the country whence he came, in accommodations of the same class in which he arrived, on the vessel or aircraft bringing him, unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper. The cost of the maintenance including detention expenses and expenses incident to detention of any such alien while he is being detained, as well as the transportation expense of his deportation from the United States, shall be borne by the owner or owners of the vessel or aircraft on which he arrived, except. . . . [special exceptions omitted.]

The court now holds that a 1981 addition abolished this found distinction from section 1253(a).

The 1981 enactment amended, in matters not presently material, the paragraph previously quoted. It added a further paragraph.

(2) If the government of the country designated in paragraph (1) will not accept the alien into its territory, the alien's deportation shall be directed by the Attorney General, in his discretion and without necessarily giving any priority or preference because of their order as herein set forth, either to—

(A) the country of which the alien is a subject, citizen, or national;

(B) the country in which he was born;

(C) the country in which he has a residence; or

(D) any country which is willing to accept the alien into its territory, if deportation to any of the foregoing countries is impracticable, inadvisable, or impossible.

According to the legislative history, this addition was to permit the Attorney General "flexibility" as to what countries the alien could be directed.[1] Judge Pettine takes as a "given" that "Congress intended to establish a common procedure for both excludable and deportable aliens." That this is apparent in particular, obvious, respects does not mean it is true across the board. The effect of Judge Pettine's conclusion is that making the Attorney General's options more "flexible" has made them more onerous. Section 1227(a)(1) still fails to contain the section 1253(a) phrase, "if that country is willing to accept," whose omission from section 1227 the Second Circuit found determinative. More important, section 1227(a)(1) still reads "shall be immediately deported," whereas section 1253(a) provides for a three month interval for inquiry of the targeted country. Here, precisely, is the nub. "Immediately" recognizes the comparative urgency when an alien, seeking admission, is in limbo. The already present alien can remain in status quo, but who is to house the one waiting at the gate while the Attorney General goes through diplomatic channels? Does the court's finding a "common procedure" mean that the phrase "shall be immediately deported" is to be read out of section 1227(a)(1)? Certainly, it cannot mean that it is to be imported into section 1253(a). This would upset the whole section 1227(a)(1) procedure.

It may be thought that we are talking about a very small matter. It is not to be gainsaid that if the excluded alien is refused entry on this return, the Attorney General has him on his hands; re-entry cannot be compelled. Judge Pettine quotes characteristic language by Judge Learned Hand in *Tom Man* that "it would be to the last degree cumbersome and oppressive to shuttle an alien back and forth on the chance of his acceptance, when it was possible to ascertain the truth in advance by inquiry," 264 F.2d *ante*, at 928, but he was speaking in respect to expulsion, section 1253(a), where prior inquiry was statutorily required—and prior to his court's recognition that in section 1227(a) it was not. *Tom We Shung, ante*. There is a difference in the situation between an individual who has been long absent and one who just left, and in practice re-entry by the latter may be much more easily accepted, with no need for cumbersome action. Moreover,

---

1. SECTION 7—DEPORTATION OF EXCLUDABLE ALIENS

 Section 7 amends section 237 of the INA to provide that, in the case of aliens who are excluded from entry into the United States but who cannot be returned to the country from whence they came, the aliens can be deported to other countries. This is currently the case only with respect to aliens who are being deported from the U.S.; present law does not provide this option for aliens who are removed from the United States following exclusionary proceedings. Present law requires an excluded alien to be removed only to the country "whence he came" to the United States; if this country does not recognize the alien's right to be returned (as may be the case of an alien who had resided temporarily in a foreign country not his home), there is no authority to return the alien to any other country, even the country of the alien's nationality or another country which is willing to accept the alien. This amendment provides the Attorney General with the same flexibility with respect to removal of aliens who are not permitted to enter the United States as it does, under section 243(a) of the Act, in the case of aliens who have entered the United States and are subsequently deported. It also eliminates the use of the confusing term "whence he came." H.R.Rep. No. 264, 97th Cong. 1st Sess. 24, reprinted in 1981 U.S.Code Cong. & Ad.News 2577, 2593.

 For Senate commentary on predecessor bill in 96th Congress, *see* S.Rep. No. 859, 96th Cong. 2d Sess. 14 (1980).

 

there is a practical side. The exclusion statute has devised a ready means in the case of rejected aliens. Under section 1227(a)(1), *see ante*, the carrier that debarks the excludable alien is, *in most instances*, financially responsible for his return, and for his maintenance meanwhile. Quite apart from the administrative problems of diplomatic procedures imposed upon the Attorney General, and housing the alien meanwhile, not only will deportation be "immediately" achieved by turning the alien back to the delivering carrier forthwith, but that carrier's interested and prompt action would seem the most likely successful method of obtaining the return. In fact, it is the government's submission, in no way contradicted, that this is the common experience.

I may wonder, incidentally, whether the delay that would result from the court's "common procedure" of diplomatic negotiations might not induce inadmissible aliens to "go for the ride," if only to enjoy the stay away from home during the diplomatic procedure. If so, it would be a further objection to watering down the statute's requirement for immediate deportment.

In sum, I do not find in the legislative history, or in the very differing circumstances and interests, the intent or the need for the radical change to identical treatment, and, with respect, I see neither reason nor excuse for brushing aside explicit statutory differences as a "detail." This is not to say, however, that what seems clear to the government may not have the same clarity to reasonable judges. The government should take this case to heart.

I accept the court's result because the government obtained petitioner's abandonment of their appeal in a prior proceeding upon an agreement that it would not return them to Afghanistan. It now appears, through representations of the government of India and the UNHCR[2], that return of petitioners to India would present a serious risk of their return to Afghanistan. The

government appears to dispute that these representations are an accurate portrayal of the actual practice of the government of India, but does not dispute their authenticity, nor offer reliable indicia to the contrary. The government should not be permitted to renege, and a ruling in its favor would incur the unnecessary risk of precisely that effect. It is not necessary to demolish a fly with a hammer, however, particularly with what I must believe to be a very wrong blow.

---

2. Some of these communications were not available to the district court. Inasmuch as they do not bear upon fact-finding on the merits, but rather upon the effects of the government's representation to the court, we may consider them.